UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X

UNITED STATES OF AMERICA, : 18-CR-00237(SJB)

-against- : United States Courthouse, Brooklyn, New York

: June 20, 2018, 9:00 a.m.

MOHAMADOE LAMINE MBACKE,

Defendant.

- - - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
BEFORE THE HONORABLE SANKET J. BULSARA
UNITED STATES MAGISTRATE JUDGE

A P P E A R A N C E S:

For the Government: RICHARD P. DONOGHUE, ESQ.
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

BY: JONATHAN E. ALGOR, ESQ.
WILLIAM PATRICK CAMPOS, ESQ.
Assistant United States Attorney

For the Defendant: FEDERAL DEFENDERS OF NEW YORK
One Pierrepont Plaza
16th Floor
Brooklyn, New York 11201-2776

BY: JAN ALISON ROSTAL, ESQ.

FEDERAL DEFENDERS OF NEW YORK, INC.

52 Duane Street
10th Floor
New York, New York 10007

BY: ISAAC WHEELER, ESQ.

A P P E A R A N C E S: (Continued)

Court Reporter: Denise Parisi, RPR, CRR
Official Court Reporter
United States Courthouse
225 Cadman Plaza East
Brooklyn, New York 11201
Telephone: (718) 613-2605
E-mail: DeniseParisi72@gmail.com

Proceedings recorded by computerized stenography. Transcript produced by Computer-aided Transcription.

* * * * *

(In open court; jury not present.)

THE COURTROOM DEPUTY: All rise.

THE COURT: Please be seated. Let's bring in Mr. Mbacke, please.

(Defendant enters.)

MS. ROSTAL: Good morning, Judge.

THE COURT: Before we begin, I have something to discuss with the parties.

Juror No. 11, Ms. Singh, inquired as to who the two individuals were who are seated behind Mr. Mbacke. She asked that of Mr. Manson. So I'm inclined to just tell the jurors generally that there are various people in the courtroom and they are not to draw any inference about one side or the other, that there may be various people in the courtroom who may not have been introduced.

MS. ROSTAL: Your Honor, I would ask that the Court simply advise that there are court personnel in addition to

people at the table with the parties.

THE COURT: Okay. How about I will say this: There are various court personnel that they will see in the well of the courtroom and they are not affiliated with the parties, but the jurors are to draw no inference one way or the other about the defendant or the government because they may see various court personnel in the well.

Is that okay?

MS. ROSTAL: Yes.

THE COURT: Okay. So what we will do is we will have the jury brought in, I will give them that instruction, and then we will have Ms. D'Aversa back on the stand to begin cross-examination.

Is there anything else the parties wish to discuss before we bring in the jury?

MS. ROSTAL: There may be some issues about documents the government wants to bring in, but I don't think those will be before the next break.

THE COURT: Okay.

MR. ALGOR: They won't be coming in until this afternoon, Your Honor. I had sent back redactions based on Your Honor's orders for the motions in limine. Ms. Rostal wants some additional redactions that I haven't seen and or agreed to.

THE COURT: Okay. So why don't we do this: Why

don't you exchange them during the morning break, and if there's anything that's not resolved, I will deal with it when I send the jurors to the lunch break.

MR. ALGOR: Understood, Your Honor.

In addition, I just want to make sure the Court saw my letter from last night regarding the media request.

THE COURT: I have not, but -- I understand that it is about the media request for the exhibits.

MR. ALGOR: Yes, Your Honor. It's the office's policy, once evidence is in, to provide that to the media. I just wanted to make the Court aware of that.

THE COURT: Okay. And so it doesn't require any action on my part.

MR. ALGOR: No, Your Honor.

THE COURT: Okay. I appreciate it. I will read the letter, in any event.

MR. ALGOR: Yes, Your Honor.

THE COURT: Okay. Anything from the defendants?

MS. ROSTAL: Your Honor, I just want to flag an issue with respect to the cross-examination of Ms. D'Aversa, and that is that as we said yesterday, there was 3500 material that I saw and that was why we took a continuance yesterday partly, and in that 3500 material --

THE COURT: Can we pause for a second? If there's new 3500 material, I don't believe it's in my binder.

MR. ALGOR: I brought it to the Court yesterday, Your Honor.

THE COURT: Oh, it's in the additional material.

MR. ALGOR: Yes. There should be one for -- it's JD -- 3500-JD-2.

THE COURT: Yes. And a TK-1?

MR. ALGOR: Yes, Your Honor.

THE COURT: Thank you. My apologies.

Sorry, please go ahead.

MS. ROSTAL: So the new 3500 material has a much more detailed timeline from Ms. D'Aversa that expands on what we had previously been provided, and there are -- there are -- I don't know -- a hundred hours or something of video, so we really narrowed our focus, obviously, to things that seemed relevant. This 3500 material JD-2 has lines indicating that at 20:17, and you'll recall that the time at which the defendant allegedly fled was 20:51, so we are talking quite a bit of time before that. She has notation "blue," and she testified that blue refers to the defendant gets up and walks to B20. The flight they were going on was out of B22. So she indicates in her notes that he was at B20 alone without the other officers two gates away, so she says that that was 30 minutes.

I cannot bring up that video at this point, I can't find it, and so what I would propose doing is asking her --

well, I'm going to offer the timeline into evidence because I think it's a summary under Federal Rules of Evidence 1006 and ask her to describe what she observed. She's obviously met with the U.S. Attorney's Office and shared that with them, so my position is that the timeline should be admissible, and if the government wants to redirect on it by bringing out videos that they chose not to play, then they can.

THE COURT: What's the government's position?

MR. ALGOR: So, I'm not entirely clear on what Ms. Rostal is saying exists or doesn't exist.

THE COURT: Well, I think the issue for discussion or consideration is she is proposing that she is going to offer the timeline full stop. I think, as I understood it, the video question is sort of just context in light of her inability to play that portion of the video, she was going to use the timeline to cross-examine the witness as opposed to culling up the video from 20:17.

MR. ALGOR: The government doesn't have an objection to introducing the timeline.

THE COURT: The timeline?

MR. ALGOR: Yes, Your Honor.

THE COURT: Ms. Rostal, I think that resolves the issue.

MS. ROSTAL: Okay. Very good.

THE COURT: Unless there's some issue that I

misapprehended about the video. You are not going to suggest that there's a missing video for which the government or the witness is responsible.

MS. ROSTAL: No. No. I certainly --

MR. ALGOR: That's fine.

MS. ROSTAL: -- I think it's fair to suggest in closing that the government, with the burden of proof, chose not to play that video, but that's a different story.

THE COURT: It's just a question of if you are going to suggest that the video was unavailable for some -- and intentionally unavailable, then certainly that would give the government an opportunity to pull up such a video, but that's not what I hear that you are trying to do.

MR. ALGOR: No. And I would expect that testimony would be that -- likely that when she wrote down that the defendant was alone, that that was not based on her review of the video, but that someone else told her that, so --

THE COURT: Well, her testimony is what it is.

MR. ALGOR: Yes, Your Honor.

THE COURT: And the jury and everyone else will hear it when it comes in.

Okay. Any other evidentiary issues?

MS. ROSTAL: No, but if the Court does have some exhibits stickers, I seemed to have --

THE COURT: I only have Court Exhibit stickers.

MS. ROSTAL: Well, I think I can improvise for now.

THE COURT: Why don't we use yellow Post-it stickers and we've got tape over there, and if you hand me your yellow pad, I will use the tape and we will do it the old-fashioned way.

MS. ROSTAL: I'm sorry?

THE COURT: You see the tape there?

MS. ROSTAL: I do have sticky --

THE COURT: So put the sticky, and to make sure it doesn't fall off, add the tape. We'll do it the old-fashioned way before the print version of the preprinted sticker.

Ms. Rostal, did you need time before I bring in the jury to make sure that the video plays properly?

MS. ROSTAL: I think we should try to do that.

Mr. Manson, if you just want to try to pop this up on the screen.

THE COURTROOM DEPUTY: Some of the footage is showing.

MS. ROSTAL: Can I bring this up here or is that one -- we would just have to --

THE COURTROOM DEPUTY: You would just have to attach it to -- un-attach that laptop and attach that one. There's actually one right there.

MR. ALGOR: If you are plugging it into a cord over there, it's the same thing.

THE COURT: There's no audio to these; is that correct?

MS. ROSTAL: Correct.

THE COURT: Mr. Manson, I don't think there's an audio issue to worry about.

MS. BEENEY: Your Honor, there are two audio clips --

THE COURT: Oh, I'm sorry --

MR. CAMPOS: Not with this witness.

(Short pause.)

THE COURT: While we're waiting, let me ask the government a question.

The defendant has indicated that he will be making, through his counsel, a written Rule 29 motion. Does the government wish to have some time to submit a written response to the Rule 29 motion?

MR. ALGOR: Yes, Your Honor.

THE COURT: Okay. So whenever it is that that comes in, we will have to figure out what overnight period I can give you to accommodate that. It may be -- obviously, I haven't read the motion, I don't know what it is going to say, and I haven't read your response. We would need to have some oral argument about it, but we can decide that after you have submitted or -- we'll just plan for it when I decide when your submission should be put in, but I'm going to try to do that

in a way that at least gives you an overnight period to respond, but also tries to minimize the disruption to the jury.

MR. ALGOR: Understood, Your Honor.

(Short pause.)

MS. ROSTAL: Okay, Mr. Manson, let's see if that works.

THE COURT: Okay. It appears to be working.

Mr. Manson, why don't you go get the jury.

(Short pause.)

THE COURT: All rise, please.

THE COURTROOM DEPUTY: All rise.

(Jury enters.)

THE COURT: Okay. Please be seated.

Ladies and gentlemen, good morning. I hope you had a pleasant evening with your families in a time where you didn't talk about the case and you didn't think about it at all.

One thing before we begin this morning.

From time to time, in the well of the courtroom -- the well of the courtroom basically from those benches to me, you are going to see various court personnel. Sometimes they are seated here, sometimes they are seated over there, sometimes they are seated over there. Those court personnel are not affiliated with either the defendant or the

government, and you are to draw no inference or make no assumptions about those court personnel who I'm not going to introduce to you because I would be introducing people all day during the trial if I had to do that. So just pay no mind to people I have not introduced to you who you see in the well of the courtroom.

So what I'm going to do now is ask the government's witness to come forward again for her cross-examination, Ms. D'Aversa.

(Witness resumes the stand.)

THE COURT: Good morning, Ms. D'Aversa. Have a seat. I just remind you that you remain under oath.

THE WITNESS: Yes.

**JENNA D'AVERSA**,

called as a witness, having been previously duly sworn, was examined and testified as follows:

CROSS-EXAMINATION

BY MS. ROSTAL:

Q Good morning. Good morning, Ms. D'Aversa. Thank you for coming back today.

My name is Jan Rostal. I'm an attorney for Mr. Mbacke. We just met out in the hallway today, correct?

A Correct.

Q Now, you've met with the United States Attorney's Office before, right?

A Correct.
Q How many times?
A Three times.
Q And when was roughly the first time you met with them?
A Last week.
Q Now, had you been reviewing videos before last week?
A Of this incident?
Q Yes.
A After it happened.
Q So starting on -- I guess it was the 28th of March, you started looking at the videos; that's when you first heard about the incident.
A Correct.
Q How many hours of videos do you think you reviewed?
A Probably five hours' worth, if not more.
Q From different sources.
A Sources and different camera angles and different locations.
Q And you were tasked then with trying to locate four individuals, right?
A Correct.
Q Who you sort of identified in your testimony by the colors that they were wearing?
A Correct.
Q Now, you were given pictures of the individuals on the

28th?
A I was shown pictures, correct.
Q And let me show you what I'll mark as Defendant's Exhibit A for identification (handing). I just ask you to take a look at those.
(Short pause.)
Q Are those the photographs that you looked at in connection with your -- the investigation?
A I believe so.
MS. ROSTAL: Your Honor, I would move Defendant's A into evidence.
MR. ALGOR: No objection.
THE COURT: Defense Exhibit A is entered into evidence.
(Defendant's Exhibit A was received in evidence.)
MS. ROSTAL: Your Honor, may I publish it to the jury?
THE COURT: You may.
(The above-referred to exhibit was published.)
Q Now, in connection with your investigation, you --
THE COURT: Ms. Rostal, do you want to let the jurors just have some time to look at it, or do you want to continue? It's up to you.
MS. ROSTAL: I can continue, I think, if that's all right.

THE COURT: Okay, go ahead.
MS. ROSTAL: Just in the interest of time.
Q In connection with your investigation, then, you were tasked with finding the locations of these individuals, right?
A Correct.
Q So you made a timeline with respect to that, right?
A Yes.
Q And you put into your timeline what you observed in the videos and reported that to the United States Attorney's Office, correct?
A Yes.
Q Let me show you what I'll mark as defense Exhibit B for identification.
May I approach, Your Honor?
THE COURT: You may.
MS. ROSTAL: 3500-JD-2.
THE COURT: Okay.
MS. ROSTAL: (Handing.)
Q So Ms. D'Aversa, is that the timeline you gave to the United States Attorney's Office?
A Correct.
Q And when did you give them that?
A They must have gotten it from the investigators that I had met with on the 28th.
Q The 28th?

A When I reviewed footage with --
Q Of March?
A Yes, of March.
Q So this document was created sometime at the end of March or beginning of April?
A Correct.
Q And this document reflects the observations that you made in connection with your investigation, correct?
A Yes.
MS. ROSTAL: Your Honor, I would move Defense B into evidence.
MR. ALGOR: No objection, Your Honor.
THE COURT: Okay. Defendant's Exhibit B is entered into evidence.
(Defendant's Exhibit B received in evidence.)
Q Now, let me ask you about that timeline.
MS. ROSTAL: Mr. Manson, if I can put that up.
Q So, Ms. D'Aversa, you first located the four individuals at 5:22 p.m., roughly, walking from B47 to B22, correct?
A Correct.
Q Do you mind if I write in 5:22 here just because -- for those of us who don't know military time so well?
Now, it was 5, then, 54 when you see them going into Buffalo Wild Wings?
A Yes.

Q And then you got the camera from Buffalo Wild Wings to get that footage?
A Yes.
Q Then you saw the white and blue shirt people go to Dunkin' Donuts?
A Yes.
Q And then at -- what is this? 7:19?
A Mm-hmm.
Q You see them going to B22, correct?
A Correct.
Q Now, then you show that the white and blue walk to the bathroom, back from the bathroom, correct?
A Correct.
Q And now blue -- is it fair to say that blue is the tall African gentleman seated at defense table?
A Correct.
Q And at 8:17 p.m., you see blue get up and walk to B20, correct?
A Correct.
Q And you noted that was alone.
A Correct.
Q He did not have white or -- I don't know what you -- green or black with him.
A Correct.
Q And then you -- your timeline shows that he was in Gate

B20 alone for 30 minutes, correct?
A Correct.
Q Now, on direct examination yesterday, the government played that clip for you.
A Correct.
Q Did they play that clip for you?
A Yesterday?
Q Yes.
A Well, I've seen it beforehand, but yes, I saw it again yesterday.
Q In court?
A Yes.
Q And what you saw, in your observation, was at B20 the blue individual without the others with him, correct?
A Correct.
Q And let me just ask you to look at Government's 8-A in evidence.

Can you see this? Can you see it?

THE COURT: I believe that's Government 8, for the record.

MS. ROSTAL: It says 8-A.

MR. ALGOR: Your Honor, we had introduced Government's Exhibit 8 and 8-A.

THE COURT: Oh, I'm sorry.

Q So, Ms. D'Aversa, B22 is the gate from which the

individuals were flying out; is that correct?
A Correct.
Q And B20 is indicated above it, correct?
A Correct.
Q And one would have to walk around a hallway to get to B20; is that right?
A The seating areas for both would be connected, so you could walk in the hallway, or if you didn't want to, you could just walk straight from the seating area to the next seating area.
Q I see.
And they're two different flights, correct?
A Yes.
Q Now, your timeline indicates that you saw the blue gentleman there for 30 minutes, right?
A Yes.
Q And you indicate in your timeline then that at 8:51 is when he appears to leave the area, correct?
A Correct.
Q So we're talking from your observations from the videos that you viewed, he was alone in B20 seating area from 20:17 to, roughly, 20:50, correct?
A Correct.
Q Now, did you see any footage at any time during the videos that you have seen of anyone putting him in handcuffs?

A I didn't see that.
Q Of anyone having him sign anything?
A I didn't see that.
Q Of anyone giving him any documentation, any papers to look at?
A No.
Q Did you see him using a phone?
A No.
Q Did you see him eating?
A From the Buffalo Wild Wings video, I don't remember if he ate or not.
Q Now, did you see any of the other individuals displaying any sort of badges or credentials?
A No.
Q If you had been looking at these videos without knowing anything about the incident, would you have known that these people were law enforcement?

MR. ALGOR: Objection, Your Honor.

THE COURT: Basis?

MR. ALGOR: May I have a sidebar, Your Honor?

THE COURT: Yes.

(Sidebar.)

(Continued on next page.)

(Sidebar conference held on the record out of the hearing of the jury.)

MR. ALGOR: Your Honor, she was asking her a hypothetical question.

THE COURT: First of all, that she's asking her witness a hypothetical question isn't necessarily a reason to object, but that's not what I believe the question was, and certainly Ms. Rostal can rephrase if that's the objection.

Is that your intention to ask a hypothetical question?

MS. ROSTAL: I can just ask the more direct question of whether there was any indication that they were law enforcement.

MR. ALGOR: That's fine. Well, that's been asked and answered.

THE COURT: That objection is overruled.

And if you ask that question, you may proceed.

MR. ALGOR: Thank you.

(Sidebar concludes.)

(Continued on next page.)

BY MS. ROSTAL:

Q Was there any indication in the five plus hours of video that you watched that the -- any of the gentlemen that you were looking for were law enforcement?

A What do you mean "indication"?

Q Any badges.

A No.

Q Any show of force?

A No.

Q Any show of restraint?

A No.

Q Any show of authority?

A No.

Q All right.

Now, let me ask you something. You said that in your direct testimony, you are really in charge with helping law enforcement at JFK.

A Mm-hmm.

Q Which I can imagine is a big job.

A Mm-hmm.

Q How many different law enforcement agencies are available to help out at JFK?

A Who do I help?

Q How many are available in the event of an incident?

A Really, it's PAPD. Port Authority Police is the number

one because they are the ones who really police that -- JFK.
Q So they sort of have jurisdiction over JFK in terms of law enforcement.
A Yes.
Q Were they notified that there would be a deportee in this airport?
A That, I don't know.
Q And when was Port Authority notified of the alleged escape of Mr. Mbacke?
A I didn't review all of the footage to see that response, but I think it was within an hour or -- sometime shortly after.
Q Not five minutes after.
A I'm not sure.
Q So Mr. Mbacke, according to your timeline -- you have blue leaves at 8:51 p.m.?
A Mm-hmm.
Q When did you first see any footage of other law enforcement coming into the -- coming onto the scene?
A I think it was a couple of -- a minute or two after.
Q Is that indicated on your timeline?
A Yes. 2:56:24.
Q Is that blue is at the departure level?
A Right before that. Green and black walk towards B20.
Q So when you say "green and black," you're referring to

the ICE officers that are pictured in Defendant's Exhibit B?
A Correct.
Q So in terms -- apart from the three ICE officers -- blue, black, and white --
A Mm-hmm.
Q -- were there any Port Authority officers called to the scene, that you're aware of?
A I didn't review the footages up to that -- to the point when they came.
Q So when you're saying that you believe law enforcement was responding to the scene, you are talking about the three ICE officers?
A No. Port Authority Police. I'm just not sure what time they came.
Q I see.
Now, Port Authority Police would be available at a moment's notice to law enforcement if there was an emergency situation, correct?
A Correct.
Q And you could go to any security officer and ask that they be called in, right?
A Correct.
Q In fact, you could put the entire airport on lockdown if it called for that, correct?
A Correct.

Q You could section off any part of the airport with security personnel, correct?
A Correct.
Q In fact, JFK is really primed for that in case there's an incident these days, correct?
A Correct.
Q Are you aware if there was ever a time within your timeline when any of the officers -- green, black, or white -- brought Port Authority Police or security in to help them?
A I -- I know they did, but I'm just not sure of what time. The main focus of pulling the footage was really of the incident itself.
Q Understood.

Okay. So what I'd like to do is play some clips for you that we have.

MS. ROSTAL: And Mr. Manson, if we could --

THE COURT: Ms. Rostal, before we play the clips, are these ones already in evidence?

MS. ROSTAL: Well, no. I've given them to the government. I would move them in as Defendant's C for identification.

THE COURT: What's the government's position?

MR. ALGOR: Your Honor, I reviewed them this morning. My understanding is Ms. Rostal showed them to Ms. D'Aversa earlier this morning.

THE COURT: The question is what's your objection, if any, to the introduction into evidence of those clips?

MR. ALGOR: There's no objection.

THE COURT: Okay. So Defendant's C, the video excerpts, are entered into evidence.

(Defendant's Exhibit C received in evidence.)

THE COURT: Is there some way I can put into the record which clips those are. Have you numbered them Ms. Rostal?

MS. ROSTAL: I have, Your Honor, and I will put them on a CD ROM that will then be introduced as a permanent part of the record.

THE COURT: Okay. Great. So Defendant's C, video clips, are in evidence.

MS. ROSTAL: And I'm also going to show the witness -- and I provided the government with the copies -- Defendant's Exhibit D for identification.

(Short pause.)

THE COURT: Do we need a break?

MR. ALGOR: Your Honor, just trying to clarify. I got the screen shots this morning and I'm trying to make sure that the screen shots she's showing are of the video files that she's going to be showing that are now in evidence, and that seems to be unclear.

(Short pause.)

THE COURT: Ladies and gentlemen, if you are going to -- Ms. Rostal, Mr. Campos, if you're going to have an extended dialogue, you have to ask my permission before you waste the jury's time.

MR. ALGOR: Yes, Your Honor.

THE COURT: Let's proceed.

MR. ALGOR: Yes, Your Honor.

MS. ROSTAL: Your Honor, may I approach?

THE COURT: Yes.

Q Let me show you what's been marked Defendant's D for identification and just ask you to take a look at those (handing).

THE COURT: Ms. Rostal, you don't happen to have a copy for me, do you?

Q If you could just flip through those and tell us whether those appear to be fair and accurate representations of screen shots of videos that you collected in connection with your investigation.

A Yes.

MS. ROSTAL: Your Honor, I move Defendant's D into evidence.

THE COURT: Any objection?

MR. ALGOR: No, Your Honor. No objection.

THE COURT: Defendant's D is entered into evidence, which are screen shots.

(Defendant's Exhibit D received in evidence.)

Q So I'm a little bit disorganized, I apologize for that, but I'm going to show you some of the screen shots first and then go over the videos that I want to show you, so let me start with the screen shots.

I'm looking at D-1 in evidence. When you were talking about the gentleman that you were identifying, the blue is obviously Mr. Mbacke, correct?

A Correct.

Q And then these other individuals with him appear to be the three men depicted in Defendant's A pictures, which I think the jury still has, correct?

A Correct.

Q And there are videos of them coming into JFK deplaning from the flight in Detroit, right -- or from Detroit?

A Correct.

Q Now, in order to take -- in order to change planes in JFK from a domestic flight to Terminal 4 where they were boarding for Senegal, they didn't need to go back through security, correct?

A No.

Q And they didn't need to collect any bags, right?

A No, 'cause it was domestic to domestic, correct, and then going to Senegal, so no.

Q So they never would have had to go through TSA at JFK.

A No.
Q Were you ever asked to get footage of TSA at JFK in connection with this investigation?
A The only footage I pulled relating to it is when the individual leaves the TSA exit area.
Q I see, but not going through security to get into JFK --
A No.
Q -- right?
There was no allegation, that you know of, that they did that --
A No.
Q -- went through security at JFK.
So this is a shot of them coming up the escalator, and this would be going into Terminal 4, correct?
A Correct.
Q And there are various videos depicting them walking through the corridors, right?
A Yes.
Q And the people-movers are -- that are here by the B24, for example, that's something that you saw them on, right?
A Yes.
Q And, for example, here you see one gentleman inside the people-mover and the blue outside, correct?
A Correct.
(Continued on the following page.)

EXAMINATION BY
MS. ROSTAL:
(Continuing.)

Q And there were other times where you saw them walking where the gentleman in blue would be behind the others; correct?
A Correct.
Q You also were able to view footage of them coming into Buffalo Wild Wings; right?
A Yes.
Q And this is a little fuzzy here, but do you recall that the blue gentleman was behind the others coming into Buffalo Wild Wings?
A I don't remember that specifically.
Q And there were times when you would see -- you did see footage of them inside of Buffalo Wild Wings?
A Yes.
Q They were there an hour, hour and a half, something like that?
A Mm-hmm.
Q And you noted in your timeline that at some point they went outside to Dunkin' Donuts; correct?
A Correct.
Q And, again, there are times when you would see the gentleman in blue behind the others?

A Yes.
Q Right.
And inside Buffalo Wild Wings you saw footage of the gentleman in blue Mr. Mbacke standing alone; correct?
A I don't remember.
Q And you also had footage of when the officers were looking for him after what you've noted as blue leaves at 8:51 p.m.; right?
A Yes.
Q So, for example, the picture that's up on the screen now would be after that indication at 20:51; correct?
A Yes.
Q So you saw the other officers sort of walking around the airport?
A Yes.
Q And in those moments that you saw them walking around the airport, did you see them running?
A No.
Q Did you see them looking angry?
A No.
Q Did you see them getting on their phones trying to call someone?
A Not that I saw.
Q At some point, you saw the one gentleman with the cap talking to someone at the exit; correct?

A Yes, at the bus gate.
Q And he talked to them for a good couple of minutes?
A Yes.
Q But nobody got on their phones?
A Not that I saw.
Q Nobody got on their walkie-talkies?
A No.
Q Nobody alerted Port Authority?
A I'm not sure.
Q So I just want to play, let's play some of these videos.

THE COURT: Ms. Rostal, if you can indicate --

MS. ROSTAL: So this one begins with the numbers 01.17.

(Video file played in open court.)

(Video file concludes.)

Q So if you see coming up in the screen with the white shirt going on the people mover; right?

And the blue shirt on the outside; correct?
A Yes.
Q There were a number of times you saw that; right?
A Yes.
Q And then this video is 01.1BWW for Buffalo Wild Wings; correct?
A Correct.
Q Okay. So, in the walkway, there here comes the gentleman

in green, the gentleman in white, and then at the end, the gentleman in blue; correct?
A Correct.
Q This one is 02BWW. And this is inside Buffalo Wild Wings?
A Yes.
(Video file played in open court.)
(Video file concludes.)
Q This one may be seven minutes long.
THE COURT: Ms. Rostal, to the extent that you fast forward you need to say that.
MS. ROSTAL: I'm not. I was asking whether that's possible.
THE COURT: Because if there is a particular part of the video that you wish to view you can move to it.
MS. ROSTAL: Yes, let me try that.
Q Okay. So I fast forwarded now to time stamp 3:40 and you see the individual in white and the one in blue standing up, and you see the individual in white now walking away?
A Yes.
Q And the individual in blue is standing alone?
A Yes.
Q Now, if I could just fast forward to see how long that goes.
So we're at 5:42 time stamp, and the individual in

blue is standing alone?
A Yes.
Q And we're at the 6:40 time stamp. The individual in blue is still standing alone?
A Yes.
Q And at 7:12, time stamp he appears to go back and sit down at the table with the others; correct?
A Correct.
Q Now, I'm playing 03BWW. And this footage depicts the white gentleman with the blue gentleman behind him going back into Buffalo Wild Wings; is that right?
A Yes.
MS. ROSTAL: Nothing this exciting has ever happened at Buffalo Wild Wings.
THE COURT: You're now playing 4BWW?
MS. ROSTAL: 4BWW now I'm playing.
Q And this video depicts the two -- the gentleman in black and the one in green eating; right?
A Yes.
Q And I'm at time stamp 2:40 and just the two gentleman still there eating.
So I'm at time stamp 3:47 and we're going to let that play for a moment.
And you see the gentleman in white coming back to the table?

A Yes.
Q And now there are three of them at the table; correct?
A Correct.
Q Black, green, and white?
A Yes.
Q And we're at time stamp 4:39 still black, green, and white; correct?
A Correct.
Q It's time stamped 5:15. Still black, green, and white; correct?
A Yes.
Q Now, while we're watching that according to the timeline, they were in Buffalo Wild Wings from approximately 5:54 p.m. until 7:19 p.m.?
A Yes.
Q Does that sound right?
A Mm-hmm.
Q And when they left Buffalo Wild Wings at 7:19 p.m., that was, what, an hour and a half roughly before you indicate blue leaves at 8:51 p.m.; right?
A Yes.
Q So we're not looking right now at a situation where blue had left and gone out of the TSA door; right?
A No.
Q So we're at 6:38 time stamp and they're still sitting

there alone?

THE COURT: Ms. Rostal when you say, "6:38 time stamp," I think sometimes you're referring to the number of minutes into the video.

MS. ROSTAL: Yes. I should clarify that.

THE COURT: And sometimes you're referring to the time stamp in the video itself which is also running. So just --

MS. ROSTAL: Right.

Q So, right now, we're looking at time stamp of the video itself, not the real time, of 7:15; correct?

A Correct.

Q And the three are still there?

MR. ALGOR: Objection, your Honor.

THE COURT: I believe -- sustained -- I believe the video time stamp -- well, I'll let you rephrase.

Q Where on the video -- well, let's stop this for a second.

Do you see the blue gentleman that just came back; right?

A Yes.

Q So that's at time stamp -- you can see down at the stamp -- the time stamp on the video, meaning, that if you go 7:minutes?

And 40 seconds into that video, that's what you see?

A Yes.

Q Right. That doesn't mean that's what time it is?
A Correct.
Q And we know from your timeline when they were in Buffalo Wild Wings, so we know that this was roughly somewhere between 6:00 p.m. and 7:20 p.m.; right?
A Yes.
Q Okay. So I'm going to play now the file marked 05.191, another escalator video.
And, once again, you see the gentleman in white -- not escalator, people mover -- on the people mover, the gentleman in blue lagging behind the other two; correct?
A Mm-hmm.
Q And then I'm playing 06.174, another escalator video.
Same situation; correct?
A Correct.
Q And I'm playing 07.173. And now I'm playing 07.210.
Now, this video appears to depict the gentleman in white with the blue hat talking to someone at the exit; right?
A Yes, the bus gate exit.
Q So this would have been after your indication that at 8:51 p.m. blue leaves; correct?
A Correct.
Q I'm just going to let that one play.
Now, I think I indicated before that when you saw the videos where that gentleman was talking to those security

personnel that you did not see anybody get on a cell phone or walkie-talkie or anything like that; correct?
A Not that I remember.
Q And this video I'm playing is 08.210.
And does this appear to be also one of the videos that depicts what happened after you indicated blue leaves at 8:51 p.m.?
A Yes.
Q And where would this be, this area?
A This would be the escalator going down to the bus gate where he was in the brief clip.
Q So this clip would likely have been before the bus gate interaction with the security personnel?
A Yes.
Q I can probably fast forward here.
I am fast forwarding to the time stamp on the file of 1:05, 1:16, 1:42, 1:48, 1:54, 2:15. And that's how far we are in the file, obviously. This video has run now for 2 minutes and 22 seconds.
And you see coming into the frame here the green and the black gentlemen?
A Yes.
Q And then the white gentleman coming up the escalator; right?
A Yup.

Q And this might be the same, 09.210. I think 09.210 we did look at, or is this a different angle?
A Yes, different angle.
Q I see. So let me fast forward that.
I'm going to 2:20 on the file and you see the white gentleman coming up the escalator; correct?
A Correct.
Q And I'll let that run.
And, Ms. D'Aversa, were you working on the 27th of March?
A Yes.
Q And were you there up until 5:00 p.m. or were you there that evening?
A Until five -- no, that day I was there until 3:00.
Q Was there someone else who was working in your position who could have checked the video that night?
A Yes.
Q And do you know did they check the video that night?
A I think the operations department did.
Q And were you called or notified about this situation at all on the 27th?
A No.
Q So the first time you heard about it was when you reported for work at 9:00 a.m. on the 28th?
A Yes.

Q Vis very. Okay.

MS. ROSTAL: Thank you. I have no other questions.

MR. ALGOR: Brief redirect, your Honor?

THE COURT: Yes.

REDIRECT EXAMINATION

BY MR. ALGOR:

Q Ms. D'Aversa, I'm going to show you what's Defense Exhibit A that's already in evidence that's your timeline.

I want to zoom in right here. And this is the 2017 timeframe which is 8:17 p.m.

Do you see that?

A Yes.

Q Now, Ms. Rostal asked you about the line below it, the 30 minutes alone?

A Yes.

Q Did you see any video of the gate waiting area at B20 and B22?

A There was only one shot that was from the retail hall facing B20, so it's very difficult to see.

Q And so, there were no cameras on that waiting area; is that right?

A Correct.

Q So when you say that he was alone for 30 minutes, is that based on the timeframe from when you saw him leaving and running through the retail hallway?

A Yes. So that's based on when I saw him walk from B22 to B20 because he had walked in the hallway here and then when he leaves.

Q When he runs away at around, approximately, 8:51?

A Yes.

Q So that's how you came up with that 20 minutes?

A Yes.

MR. ALGOR: Nothing further.

THE COURT: Just for the record, that's Defendant's B.

MR. ALGOR: I'm sorry, your Honor.

THE COURT: Not Defendant's A correct.

MS. ROSTAL: Defendant's A, I think was the picture.

THE COURT: So just for the record that was Defendant's B.

MR. ALGOR: Yes, your Honor.

THE COURT: Any re-cross?

MS. ROSTAL: May I, your Honor.

THE COURT: Please. Limited to the topic on redirect.

MS. ROSTAL: Yes.

RECROSS-EXAMINATION

BY MS. ROSTAL:

Q You just stated that the video that you -- let me put the timeline up if we could.

The video that you reviewed showing that Mr. Mbacke was alone in B20. You included that based on the fact that you saw him walking alone toward the B20 seating area.

Do I understand that right?

A Yes.

Q And you did not see blue, green, or white walking with him with at that point?

A No.

Q Did you see cameras trained on blue, green, and white during that time period?

A No.

Q Because you couldn't see the gates at all?

A Correct.

Q So, in other words, you could see the hallway but not the gates?

A Correct.

Q You saw Mr. Mbacke walking by himself to B20?

A Yes.

Q Correct. And then the next time you saw Mr. Mbacke is at 20:51 when you say you saw him running?

A Yes.

Q Right.

So, in that time period, I'm sure that you were very careful to see if any of the other three gentlemen followed him in the hallway to B20; correct?

A I'm not sure. Probably.
Q Well, you were looking for four men, right --
A Yes.
Q -- in videos?
I'm sure you would have noticed if there were any of the other three that you had been watching in Buffalo Wild Wings and Dunkin' Donuts and that sort of thing walking down the hallway after Mr. Mbacke, would that be fair to say?
A Yes.
Q So your conclusion that he was there for 30 minutes alone is based on your review of those videotapes; right?
A Yes.
Q And if you can just tell the jury the difference -- you know the airport well; correct?
A Yes.
Q So the distance from B20 to B22, can you tell us just with respect to the courtroom, for example, from where you're sitting how far would Mr. Mbacke have been sitting away from B22?
A Probably the wall in the back.
Q All right.
MS. ROSTAL: So let the record reflect 40 feet, 40 years.
THE COURT: I'll see the record she has indicated the distance in her perception, whatever that may be, from the

witness box to the back of the courtroom.
Q And in between the B20 seating area and the B22 seating area are other seating areas; right?
A Other seats, yes.
Q Other seats; correct?
A Yes.
Q And then you see where the jurors are sitting and there's seven seats on the front row; right?
A Yes.
Q So it's much more than seven seats to the back of the courtroom; correct?
A Correct.
Q And in a busy airport you would also have passengers between where you're sitting and the back of the courtroom; right?
A Yes.
Q And airline personnel; correct?
A Correct.
Q And security; correct?
A Correct.
MR. ALGOR: Your Honor, objection.
THE COURT: Sustained.
MS. ROSTAL: Thank you, Judge, I have nothing further. I appreciate you coming in.
THE COURT: Ms. D'Aversa, thank you. You may step

down.

MS. ROSTAL: Your Honor, if I could publish Defendant's B to the jury.

THE COURT: You were showing it on the screen. At this point, you can show it at another appropriate time.

MS. ROSTAL: That's fine.

MR. ALGOR: Just to be clear, your Honor, on Exhibit B Ms. Rostal was writing on it, so I think we should provide a clean copy.

THE COURT: That's the reason I was suggesting that we do it at this time.

Ladies and gentlemen, I'm informed that we need to get to the very important business of having you pick out what you want for lunch. And so, as a result, we're going to take a 15-minute break so you may do so and we can make sure that you're properly fed and the food is ordered. I make no light of this because I know that when we get hungry we become like that Snickers commercial.

All rise, please.

(Jury exits courtroom at 10:52 a.m.)

THE COURT: Please be seated. Ms. Rostal, one small thing I know the parties proceed as if I'm a potted plant in the back of the room, but you showed two exhibits to the jury that you didn't give the court copies of. I know there was no objection to but I do like to look at them both so I can

ensure that they're not running accidentally not intentionally afoul of the motion in limine ruling I'm happy to take time to get a copy but I just asked that you give me a copy.

MS. ROSTAL: I apologize, yes.

THE COURT: Anything else before the recess.

MR. ALGOR: No, your Honor.

THE COURT: All right. Thank you so much.

(A recess in the proceedings was taken.)

MS. ROSTAL: Your Honor, we do have some issues to raise before the witness cops in.

THE COURT: We're waiting for one more person and then we can bring in the defendant and then well do everything on the record.

(A brief pause in the proceedings was held.)

THE COURT: I understand there's some issues to be raised.

MR. ALGOR: I guess, your Honor, we have some disagreements about some redactions as well as one of the exhibits where I understand the defense is going to make an argument that it's inadmissible so I don't know if you want to address those now.

THE COURT: Why don't we address those now so we can not have to go to sidebar.

MR. ALGOR: Yes, your Honor. They're not coming in through this witness.

THE COURT: Okay.

MR. ALGOR: So I don't know if you want to wait until the lunch break to deal with them.

THE COURT: Why don't we wait until the lunch break and I'll have you just take whatever time is necessary.

MR. ALGOR: Okay.

THE COURT: Is there anything else before this witness, Ms. Rostal?

MS. ROSTAL: No, your Honor.

THE COURT: Okay. So why don't we, I guess we'll wait for Mr. Manson because I assume they're still taking the lunch order.

(A brief pause in the proceedings was held.)

COURTROOM DEPUTY: All rise.

(Jury enters courtroom at 11:18 a.m.)

THE COURT: Okay. Please be seated.

The Government may now call its next witness.

MR. ALGOR: The Government calls Deportation Officer Scott Hall.

(Witness takes the witness stand.)

THE COURT: Please state your full name for the record.

THE WITNESS: Scott Hall.

COURTROOM DEPUTY: And spell your last name.

THE WITNESS: S-c-o-t-t H-a-l-l.

COURTROOM DEPUTY: Please raise your right hand.

**SCOTT HALL**, called by the Government, having been first duly sworn, was examined and testified as follows:

THE WITNESS: I do.

COURTROOM DEPUTY: You may have a seat and speak into the mic.

(Continued on the next page.)

DIRECT EXAMINATION
BY MR. ALGOR:
Q Good morning.
A Good morning.
Q Officer Hall, who do you work for?
A Department of Homeland Security, Immigration and Customs Enforcement.
Q And what is Immigration and Customs Enforcement stand for?
A It's -- we do the immigration cases.
Q Is it also known as "ICE"?
A Yes.
Q How long have you worked for ICE?
A Eight and a half, almost nine years.
Q What is your title?
A Deportation officer.
Q Have you had that title the entire time you've worked for ICE?
A No, I was an immigration enforcement agent form the first six years of my career.
Q Where do you physically work?
A Detroit, Michigan.
Q Have you always worked out of Detroit?
A No, prior to Detroit I worked in Grand Rapids, Michigan for four years. Before that I worked in Columbus, Ohio for a

year and a half. And before that I worked in Lumpkin, Georgia for two years.

Q And at all those locations you were working for ICE at that time?

A Yes.

Q Are you a member of a specific team?

A Yeah, the alternatives to detention unit.

Q How long have you been a member of that team?

A Since October of last year.

Q And what is the alternative to detention team?

A Where people that are arrested by ICE, they combine housing, get orders or supervision, get release from custody, and we monitor them while they're released.

Q As part of your responsibilities in the alternative to detention team, are you ever involved in removing an individual based on an immigration judge's order?

A Yes.

Q How many times have you removed someone pursuant to an order of removal?

A Seven.

Q And what countries were those seven trips to?

A Russia. Albania. Panama. Guatemala. Albania again. Micronesia.

Q When was the last time you removed an individual from the United States?

A February of this year.
Q Officer Hall, does ICE have a formal policy regarding how a deportation officer is supposed to remove an individual from the United States?
A Yes.
Q And when was the last time you read that policy?
A Two days ago.
Q Did you receive any training in connection with removing an individual from in the United States?
A Yes.
Q And when did you receive that training?
A In our academy. Nine years ago.
Q Does ICE have a policy regarding whether an individual being removed from the United States should be handcuffed?
A Yes.
Q And when was the last time you read that policy?
A Two days ago.
Q Now, during the six to seven trips where you removed someone from the United States, how many times did you have them handcuffed?
A Zero.
Q Why?
A In our policy, it states that the airlines have the final say over who can get on the plane. The pilot has the definitive final say. So we don't cuff them because it makes

them uneasy. So they can kick us off, so we don't cuff them to avoid that problem.

Q Now, Officer Hall, I'm going to turn your attention to March 27 of this year.

Were you working that day?

A Yes.

Q What were you assigned to do that day?

A Remove someone from the United States.

Q How did you go about getting assigned to that task?

A I volunteered for it.

Q Can you explain the process of how you would volunteer to remove someone from the United States?

A When a removal comes up, they send out a mass email to all the officers in the office. Those that want to volunteer can via email, and the top two highest on the list, or top three in this case, would be chosen.

Q How does the ranking structure work for being at the top of that list?

A It's a rotating list. If you get selected to do a removal, you get moved to the bottom of the list.

Q When did you learn the identity of the individual that you would be removing from the United States?

A Approximately a week before. Couple days before.

Q What, if anything, did you do once you learned about the individual that you would be removing?

A After I got his alien registration number, I looked him up in our system and looked at his background.
Q I want to turn your attention to approximately 10 a.m. on March 27th of this year.
Where were you?
A At the airport.
Q Why?
A For removal.
Q After arriving at the airport, what did you do?
A I met up with my two parents and we went to the ticket counter area so we could receive the subject that was being removed.
Q Would you recognize that individual that you were removing on March 27th of this year if you saw him?
A Yes.
Q Do you see him today in the courtroom?
A Yes.
Q Could you please point to him and indicate an article of clothing?
A He's wearing looks like a white button shirt.
MR. ALGOR: Your Honor, the witness has indicated the defendant.
THE COURT: The record will reflect that Officer Hall has identified Mr. Mbacke.
Q Now, Officer Hall, how did the defendant come to your

attention that day?
A Officer Koval and Officer Siddhu brought him to the airport from where he was being held and delivered him to us.
Q Was the defendant in handcuffs when he arrived at the airport?
A While he was still in the car, yes.
Q What happened next?
A When they arrived, they uncuffed him, gave his property and the removal packet, and turned him over to us.
Q What is a removal packet?
A It's just an envelope with his travel document and the removal papers that we would serve on him.
Q Once you received the defendant and the removal packet from Officers Koval and Siddhu, what did you do next?
A I went to the ticket counter, arraigned our seating, got all our tickets, and then we went through the TSA security and went to the gate.
Q And approximately how long did it take you to do that process?
A Probably close to an hour.
Q While you were walking to the boarding gate, was an officer with the defendant the entire time?
A Yes.
Q At approximately what time did you depart Detroit on March 27th of this year?

A I believe 3:30.
Q And what was the destination of your flight from Detroit?
A JFK in New York.
Q While on the plane from Detroit to JFK, where did you sit?
A In the back row in the aisle seat. Directly across the aisle from me was Officer Lassiter. Next to him was the subject. And right in front of me in the aisle seat was Officer Camaj.
Q Was the defendant in the aisle seat or the window seat?
A The window seat.
Q Is there a reason why you and the other officers sit together with the defendant?
A Well, yes, policy that we sit with him near on the plane because if he gets up, starts a commotion, whatever, we need to be close by to shut it down.
Q At approximately what time did you land at JFK Airport from your flight?
A 5:30-ish.
Q Do you recall what terminal you arrived at?
A 4.
Q And what gate did you arrive at at Terminal 4 of JFK Airport?
A B47.
Q Once you arrived at Terminal 4, Gate B47, what did you do

next?
A We exited the plane and walked to our departing gate of B22.
Q How long did it take you to get from B47 to B22?
A Twenty, 30 minutes.
Q While you walked to Gate B22, where was the defendant?
A He was walking with us. We were walking in a group.
Q And B22, what was the significance of that gate?
A Just that was our departure gate.
Q Once you arrived at the departure gate from B47, what did you do?
A I went up to try to arrange our seating again so that we could all be sitting together.
Q And what, if anything -- and who did you speak with there?
A I spoke to one of the gate agents. Unfortunately we were so early that wasn't the gate agent for our flight so they said to come back later.
Q What did you did next?
A We talked about going to eat food and walked back to the Buffalo Wild Wings that we passed.
Q While at Buffalo Wild Wings, who, if anyone, ate any food?
A Officer Camaj and myself ate dinner. Officer Lassiter and the subject did not.

Q Where was the defendant while you were at Buffalo Wild Wings?
A Sitting next to Officer Lassiter.
Q Did the defendant at any point get up?
A Yeah, he asked if he could go for a walk, and him and the Officer Lassiter went and walked around a little bit.
Q Did you see where the defendant and Officer Lassiter went?
A No.
Q Do you recall when they returned back to Buffalo Wild Wings?
A Yeah, they came back a little bit later.
Q At approximately what time did you finish your dinner at Buffalo Wild Wings?
A I really can't recall what time that was.
Q Once you finished dinner, where did you go next?
A We got our stuff, walked back to the gate.
Q And by "gate" you mean your departure gate?
A Yes.
Q Once you arrived at your departure gate, what did you do next?
A I went and asked again if I could arrange the seating. They said it was still a little too early. So we went and sat.
Q Can you explain to the jury where you, the other officers

and the defendant sat at this time?
A I sat on one -- closer to one of the end seats towards the window away from the concourse. There's a couple empty seats between me, and the subject was sitting there. And next to him was Officer Lassiter. Across from them was Officer Camaj.
Q Approximately how far away were you from the defendant at this time?
A Seven feet.
Q While in the waiting area what, if anything, was the defendant doing?
A He -- we were all sitting there doing whatever. He asked if he could use Officer Lassiter's phone to make some phone calls.
Q Do you recall how long the defendant was on Officer Lassiter's phone?
A Thirty, 40 minutes.
Q Did you hear anything that the defendant said on the phone?
A I didn't really hear a lot. I wasn't paying too much attention. Some of it was in a foreign language.
Q While the defendant was on the phone, on Officer Lassiter's phone, what were you doing?
A Just sitting there.
Q Did the defendant get up at any point while you were in

the waiting area?
A Yeah, he asked -- he said he saw someone he knew, his cousin. And he asked if he could go sit with him. Officer Camaj asked him a couple of questions and he said, yes, go ahead.
Q Prior to that moment, did the defendant leave the gate, the waiting area at any point?
A Yes. He went to use the restroom.
Q And when the defendant went do use the restroom, did any of the officers go with him?
A Yes, Officer Lassiter went with him.
Q Now, I want to turn back to what you just previously testified about.
What, if anything, happened once the defendant and Officer Lassiter returned from the bathroom?
A Well, he came and sat down a little bit. Then he said he saw his cousin and asked if he could go sit with him.
Q And how far away would you say the defendant was when he went to go speak to his cousin?
A If I had to guess, maybe 30 yards.
Q Once the defendant was approximately 30 yards away, what did you do?
A I picked up my bag and moved it over to Officer Camaj. I stood in front of Officer Camaj talking to him while watching the subject.

Q And so during that time, you were observing the defendant speaking with an individual?
A Yes. Yes.
Q Did there come a point where you ever left the area to look for the defendant?
A Yeah, I walked over -- I went to the concourse and walked over by where he was sitting. He was way back up against the window. I stayed on the walkway, just walked over there, make sure he wasn't doing anything he was supposed to and walked back.
Q How often did you do that while you were in the waiting area?
A Twice.
Q When you walked over the first time, what did you see?
A I saw him speaking to somebody sitting next to him and waived his hands, smiling.
Q And then you said that there was a second time when you walked over?
A Yes.
Q And at this point, how far were you from the defendant?
A However far the walkway is to the window. Maybe another 20 yards.
Q When you walked over a second time, what did you say?
A Same thing. He was sitting there up against the wall.
Q What happened next?

A I went back, stood there for a little bit longer maybe, and then told Officer Camaj and Officer Lassiter that I was going to find a coffee shop. We were getting ready to board maybe in 30 minutes, so I went walked maybe find some coffee.
Q In what direction did you walk?
A I walked past him again, and turned right, and walked out in the concourse.
Q At that point, had you ever walked down that concourse before?
A No.
Q And approximately what time did you leave to go to the coffee shop?
A 8:45-ish.
Q Did you eventually find a coffee shop down that concourse area?
A Yeah, I walked what seemed to be almost all the way down, found a coffee shop and then walked back.
Q And once you walked back to the gate area, what happened inspect?
A I told Officer Camaj I found a place to get coffee. If he wanted to, we could walk back down there. And then Officer Camaj suggested I go and arrange our tickets. So I went and stood in kind of a long line.
Couple minutes later, Officer Camaj came back over said, hey, they walked the tickets over to us already, we're

all set. So me and him went back over by Officer Lassiter and said, Hey, we're going to get coffee, we'll be back in a little bit.

Q And did you and Officer Camaj walk to get coffee then?

A We started walking away and I looked over and noticed that the subject wasn't there any more, and I asked Officer Camaj, Hey, where is he? So...

Q Once you realized that the defendant was no longer in the waiting area, what did you do next?

A We took an immediate look around make sure he didn't just move, was sitting somewhere else or was in a store. That took maybe a minute.

Went back to Officer Lassiter, told him that, you know, he's gone. Get your stuff. So we did a broader search of the area. Couldn't find him.

Q As part of that broader search, what did you do?

A We looked for a little bit and I went back to the gate area and had him paged.

Q And at this time, what was going on at the B22 gate area?

A They were lined up. They were boarding the plane. Everyone was kind of organized around the gate, actual.

Q And that was your flight?

A Yes. Yes, it was.

Q As part of that broader search, did you find any exits?

A We saw some stairs going up. We didn't go up them

because we were trying to stay on the same level.

And after I had him paged, I waited until maybe half the plane was full, realized he wasn't coming back, so I went back down that same hallway and went up those stairs.

Q And where did those shares lead to in Terminal 4?

A To a TSA checkpoint.

Q And once you arrived at that checkpoint, what did you do?

A I talked to the, what seemed like lead investigator there, told him the situation, that we had someone abscond, someone who took off. He mobilized the uniform TSA agents to do an immediate search of that area.

Q What was the result of that search?

A They didn't see anything. They didn't find him. There was also a plainclothes-ed police officer, I believe, and they were trying to go through video to see if they saw him leave that exit.

Q Did there come a point where you contacted the Port Authority police?

A Officer Camaj, I believe, contacted the Port Authority.

Q Why didn't you call the Port Authority police?

A We don't have the Port Authority in Detroit. It really didn't -- never even crossed my mind.

When we're in the airport, I think security and who's watching, I think of the TSA.

Q Who, if anyone, did you call once you realized at the TSA

check point that the defendant wasn't there?
A I was in regular contact with both Officer Camaj and Officer Lassiter giving updates on what I was doing and getting updates on what they were doing.
Q After you had finished the search of the TSA checkpoint, where did you go?
A I headed back down to Gate B22 where Officer Camaj and Officer Lassiter were there talking to CBP and the Port Authority.
Q What happened once you returned at that gate area?
A We talked for a few minutes. Shared whatever intel we got. And one of the CBP officers asked if I wanted to go down to the command center to look at footage.
Q And did you go to that command center?
A Yes.
Q Did you review any surveillance footage at the command center?
A Yes, we went through from the time we got off the plane until we saw him get into a taxi.
Q By "him" you mean the defendant?
A Yes.
Q What happened after you reviewed the surveillance video at the command center?
A We all ended up in the command center. There was us three. There was plainclothes CBP officers. Uniform CBP

officers. Homeland Security Investigations. And there was quite a few people down there. We talked about what they were going to do to further investigate. And by about midnight or so, we went back to the hotel.

Q And so did you participate in any of the investigation after the defendant --

A Not after that point.

Q Why not?

A Because we were there, we were not part of that office, we didn't have any of our vests, guns. So we couldn't go out and we weren't allowed to do that.

MR. ALGOR: Mr. Manson, may I have...

THE COURTROOM DEPUTY: Counsel, what are you putting up?

MR. ALGOR: Something on the Elmo.

BY MR. ALGOR:

Q I'm showing you what's been previously admitted into evidence Government Exhibit 9A.

(Exhibit published.)

Q Do you recognize Government Exhibit 9A?

A Yes. That's the Buffalo Wild Wings we were ate at.

Q And you ate at that on March 27th when you were removing the defendant?

A Yes.

Q Now, I'm going to show you what's already in evidence as

Government Exhibit 9C.

(Exhibit published.)

Q Do you recognize Government Exhibit 9C?

A Yeah, that's a picture of the Gate B20 at JFK Airport.

Q And can you describe to the jury what that area represents?

A That's the same gate area we were sitting at. I mean one is labeled B20, one B22, it's one big area.

Q And where is that camera in relation to -- where is that camera picture taken from?

A If that is taken from the hallway I walked down to find a coffee shop facing the -- what would be the outside of the airport.

Q I'm going to show you know what's been already admitted into evidence as Government Exhibit 9D.

(Exhibit published.)

Q Do you recognize Government Exhibit 9D?

A Yes, that's a picture of the same thing only further back. Gate B20.

MR. ALGOR: May I have the video, please.

Q I'm just showing you what's already in evidence as Government Exhibit 10.

Did you have an opportunity to review Government Exhibit 10 before testifying?

A Yes.

Q These video files of surveillance footage that you reviewed?
A Yes.
MR. ALGOR: With The Court's permission, I want to play the first video file in Government Exhibit 10.
THE COURT: You may play it.
MR. ALGOR: Thank you, Your Honor.
(Video recording played.)
Q Do you recall where you were in Terminal 4 at this time?
A Yeah, we were walking from the Gate B47 to Gate B42.
Q And do you seethe timestamp at the bottom corner right?
A 5:37.
Q I want to pause it here.
Do you recognize any of the individuals in that video?
A Officer Camaj to the left and the front. That's myself on the right in the front. Officer Lassiter is directly behind me. And the subject is directly behind Officer Camaj.
MR. ALGOR: Your Honor, with the Court's permission, I'll play file two.
THE COURT: Go ahead.
MR. ALGOR: Thank you.
(Video recording played.)
Q And if you could please describe to the jury what this is showing?

A This is showing us still walking from our first gate to our second gate in a group, kind of going through foot traffic.
Q I'll pause it here.
Can you identify any of the individuals in this video file?
A Officer Camaj in the front. Myself behind. And then Officer Lassiter behind me. And the subject behind Officer Camaj.
MR. ALGOR: Your Honor, with the Court's permission I'll play file three.
THE COURT: Go ahead.
(Video recording played.)
Q I'll pause it here for a second.
Do you recognize where this is in Terminal 4?
A Yes, it's the hallway that I walked down to to find a coffee shop.
Q And if you could describe to the jury where that coffee shop would be in relation to the video?
A Quite a distance past there.
Q And would it be on the side, on the side towards the top of the screen, or on the side towards the right of the screen?
A It would be on the side towards the bottom. It was on my left as I walking in that direction.
Q Thank you.

Officer Hall, do you recognize anyone on this video?
A That's the subject walking, and now running, down the upper part of the screen.
Q How do you recognize the defendant?
A Same shirt.
Q Did you also see that video on March 27th when you were at the command center?
A I did.
MR. ALGOR: Your Honor, with the Court's permission, I'll play the file five.
THE COURT: Go ahead.
MR. ALGOR: Thank you.
(Video recording played.)
Q Do you recognize anyone -- I going to pause it at the start.
Do you recognize anyone in this video file?
A That's the subject with the light overshirt next to the woman.
Q I'll play the file.
(Video recording played.)
And is the defendant running in the direction where you went to the coffee shop?
A Yes.
MR. ALGOR: Your Honor, with the Court's permission, I'll play file 11.

THE COURT: Go ahead.

(Video recording played.)

Q Do you recall reviewing this video --

A Yes.

Q -- at the command center?

And where is this video located?

A This is outside of JFK.

Q And why did they review this video file?

A As we were going through hours of footage, we were looking for any time we could see where he was going, and with their familiarity with the airport, they kind of determined where he was headed so they pulled this one up and we will see him exit the door shortly.

Q I'll fast forward to --

A That's him right there.

Q You see the defendant?

A Yes. He's approaching the taxi. And now he's having a conversation.

Q While you were at command center, did they make a determination on who that taxicab driver was?

A Yes. It took us a while because of the glare from the headlights on the license plate, but we were able to finally get it.

MR. ALGOR: Your Honor, could I have a moment?

THE COURT: Yes.

MR. ALGOR: Nothing further, Your Honor.
THE COURT: Any cross-examination?
MS. ROSTAL: Yes.

CROSS-EXAMINATION
BY MS. ROSTAL:

Q Good morning, Officer Hall.
A Good morning.
Q We just met out in the hallway?
A Yes. Yes.
Q And you met with the U.S. attorney's office before in preparation for your testimony?
A Yes.
Q And so you know that I represent Mr. Mbacke?
A Yes.
Q Now, I had you met Mr. Maybe before March 27th?
A No.
Q So the first time you laid eyes on him was that day?
A Yes.
Q Now let me ask you something about your previous deportations that you did.
You said you had done like seven deportations before?
A Yes.
Q Now, were all -- and all of those deportees were in custody?

A Prior to us receiving them at the airport, yes.
Q So you mean they had been in an immigration detention facility before you took them to the airport?
A Yes.
Q But at the airport, they weren't in custody?
A They are in custody, they are just not restrained. There's no restraints on them.
Q I see.
Now, when you met -- before you met Mr. Mbacke at the Detroit airport, had you and your team had any sort of meeting to devise a plan, a tactical plan, about how you were going to handle this?
A No. And I hadn't done that on any other escort.
Q So you just show up? And take somebody and put them on a plane?
A That oversimplifies it, yeah.
Q Well, let me ask you this. Did you have any conversation with Mr. Mbacke at all when you met him?
A We introduced ourselves.
Q You said, Hi, I'm Officer Hall?
A Yes.
Q He said, I'm Mr. Mbacke.
What else did you talk about?
A Well throughout the time in Detroit, we, you know, told him basically, you know, we're going to be going with you

we're removing you. And, you know, we're nice people, you act nice, we act nice. You know, just try to keep things calm and civil as possible. We want to treat him like a person, just like we want to be treated like people.

Q But he is not your friend?
A No.
Q When you're doing that, correct?
A Correct.
Q He's not an associate of business or pleasure, correct?
A No.
Q You're an officer of the law and he's essentially a prisoner; would you agree with that?
A Yes.
Q That's your perspective?
A Yes.
Q Did you tell him, You are a prisoner?
A No.
Q Did you tell him, You are going to be in handcuffs if you don't behave yourself?
A No, we told him if he doesn't behave himself, then we would restrain him.

I didn't specifically say, We'll put handcuffs on you. But we said, You know, if you make things uncomfortable we're going to have to make things uncomfortable for you.

Q Understood.

When you first met him outside of the Detroit airport, did you give him any paperwork showing that you had authority to take him into your custody?
A We served him with his removal paperwork in the Detroit airport.
Q Who is "we"?
A Officer Camaj, myself, and Officer Lassiter.
Q So when you say you served him with removal paperwork, tell me what that means?
A It's two pieces of paper, essentially, that he signs and fingerprints saying we are he removing you, and one of the papers has a penalty for the removal, which is he can't come back for a certain amount of time.
Q So a piece of paper that he signed saying, We are removing you, right?
A Yes.
Q Did that piece of paper say, We are taking you into our custody so that if you escape, it's against the law?
A He was already in custody. When he was picked up from wherever they picked him up. He was in custody when he was in the car. He was in custody when he was with us. Just because you're not wearing handcuffs doesn't mean you're not in custody.
Q Let me ask the question again.
A Okay.

Q Did you give him a piece of paper that he signed that said, You are in custody and if you escape it's against the law?
A No, we gave him a piece of paper saying that you must leave the country.
Q So piece of paper said you must leave the country, correct?
A Yes.
Q You didn't say you have to leave the country in custody, right?
A No.
Q Now, you have -- you've been an immigration officer for nine years, correct?
A Yes.
Q Now, many deportations happen with people who are not in custody at all, correct?
A That is correct. We call them verified departures.
Q And a verified departure can be escorted by an agent, correct?
A Yeah.
Q And that agent takes the person to the airport and walks them to the gate, correct?
A Sometimes they meet us at airport.
Q And sometimes that agent even accompanies the person on the flight, correct?

A Yes.
Q And in a verified departure, you are -- the alien or the deportee is not officially in lawful custody, correct?
A No, I'd say that's incorrect.
Q What kind of custody are they in?
A They're in custody. If we're sitting there, even if they're just get on a plane in Detroit to go to, say, Guatemala, they're still with us. We would still detain them and restrain them if they tried to leave.
Q Well, let me ask you this. When you're doing a verified deportation, let's say somebody from Guatemala, they can meet you at the airport?
A Yes.
Q Somebody can drive them there and drop them off?
A Yes.
Q And then you walk them to the airplane.
A Yes.
Q Now, would you call that "custody"?
A Yes, they bring themselves to us and put themselves in custody.
Q And put themselves in custody, how does one put one's self in custody?
A In the alternatives to detention, those are the people that are not incarcerated. We -- they come with a report to us. And if their removal is imminent, we discuss it with them

and say, We have tickets for you, we have your passports, we have everything. Meet us at the airport at this specific time this specific place.

They come to us. We don't have to the put handcuffs on them, they're still in our custody. We take them, we help them get their tickets -- well, get their boarding passes. They come through security. Go sit at the gate with them. If they're going directly out of the country, we will actually walk down the jet bridge verify that they get on the plane, wait for the plane door to close and wait for the plane to push away before we leave.

Q And that person who drove themselves to the airport and met you there, could that be someone who was in the alternative to detention program?

A Yes.

Q So -- now you know that Mr. Mbacke had been in the alternatives to detention program?

A Right.

Q And, in fact, Officer Lassiter was his supervising officer for that --

A Correct.

Q -- correct?

Just like you do now for the people that you're supervising in alternatives to detention, correct?

A That's correct.

Q Now, tell me, do you think that the people you're supervising now in alternatives to detention are in custody?
A No, they're not in custody.
Q So let's use a --
A But they are being monitored. They're not in custody, but they are monitored.
Q Monitored by an electronic bracelet?
A Or a monthly phone call. And they come to report to us anywhere from once a month, once a year, but they are still -- we keep tabs on them.
Q So you don't consider keeping tabs on them in custody.
A Not in that respect, no. But if they do miss a phone call, if they do -- if their GPS pings because they are going where they're not supposed to, then we go and restrain them and incarcerate them.
Q Okay. Is it -- let me just ask you your understanding of custody, if we can get into that.
Let's say you had somebody from Guatemala and you have them in alternative to incarceration, and they are bracelet pings.
A Yes.
Q And you had to go out and find this person.
Are you with me?
A Yes.
Q If you arrest that person --

A Yes.
Q -- did they escape from your custody?
A No, because they have certain leeways in the alternatives to detention program which would let them go maybe somewhere anywhere in Michigan let's say. And if they leave Michigan, we get a notice, we get an alert.
We can call and say, Hey, why did you leave Michigan? Oh, I'm going to a baptism in the state.
We talk to them, you signed papers saying that you're supposed to alert us if you're going to leave, we have to give you permission. It is then our discretion whether or not we want to arrest them or not. If I want to detain them, I can.
Q Do you consider if they left the state of Michigan without your permission, that that would be an escape?
A We call that a possible absconder and, yes.
Q And, yes, it would be an escape in your mind?
A Semantics but, yes, absconded. It means they were running from what they are supposed to do and what they agreed to do.
Q Well, semantics are important here.
Do you understand that?
A Yes.
Q So when you say that Mr. Mbacke was in custody --
A Yes.

Q -- that's based on what in your mind?
A He was detained in a jail, from what I understand.
Q In a detention facility, the Calhoun County detention facility in Michigan?
A Yes. Yes.
Q And that's a facility that has some kind of contract with immigration to keep immigration detainees?
A Yes.
Q And you know that he was detained there while awaiting travel documents, correct?
A Yes.
Q And you don't know from your personal observation whether there was ever any kind of release from that detention; do you?
A There was no release.
Q How do you know that?
A Well, I looked at his file. I looked at his case and there was nothing in there about him being released.
Q Were you looking for that specifically?
A No, but I read all the comments in the case.
Q And you know that he had previously been released by ICE headquarters in Washington, correct?
A Yes. Yes.
Q Now, you said when you are supervising people who are on alternatives to detention, you give them paperwork that tells

them what the restrictions are, right?
A Yes.
Q And that spells out things like you can't leave the state of Michigan, right?
A Yes.
Q It spells out things like you have to keep your tether in good condition, correct?
A Yes.
Q It spells out that you have to come see me this frequency, right?
A Yes.
Q All those things are on paper?
A Yes.
Q And you -- it's important that the person that you're supervising understand what the boundaries are.
Would you agree with that?
A Yes.
Q So to do that, you sit down with them and have a meeting; don't you?
A Yes, when they first report to us.
Q And in that meeting, you go over that list of restrictions, right?
A Either we do it or the person that put them on an order of supervision would do it. But, yes, generally if they come to see me for the first time, I explain it to them.

Q Well, you would want your supervisees to know the rules; isn't that fair?
A Yes.
Q So they sign a piece of paper that says these are the restrictions on my freedom; do they not?
A Yes.
Q Did Mr. Mbacke sign a piece of paper that said what the restrictions on his freedom were on March 27th?
A No. But I believe he had an order of supervision prior and he violated the conditions of it, so they put him back into incarceration.
Q So you're referring to what, an order of revocation?
Have you seen an order of revocation in this case?
A I have not seen his, no.
Q Well, I thought you said you read the whole file.
A No, I read his case notes in our computer system. I didn't read the whole file.
Q So do you know if there was an order of revocation of his prior release?
A I believe there was.
Q But you haven't seen it?
A I have not seen it.
Q And do you know who signed that?
A No.
Q Do you know who authorized it?

A No.
Q And that wasn't in the packet that you received at the airport?
A I don't remember looking through the packet. I signed the 205, but I don't remember --
Q What is the 205?
A That is his warrant of removal.
Q And what did you sign off on, what were you signing?
A I was signing for his removal.
Q Signing for his removal that you were going to be doing it?
A Yes.
Q Well, he didn't get removed.
A Not yet.
Q Who's the field director in Detroit?
A Rebecca Adducci.
Q Did you ever talk to her prior to March 27th about Mr. Mbacke?
A No.
Q Do you know if she had anything to do with this case?
A No.
Q And you said he was being deported in your mind on the basis of an immigration judge's order?
A Yes.
Q Of deportation?

A Yes.
Q Now how many aliens get deported say in a year?
A I have no idea. A lot.
Q Like thousands, right?
A Yes.
Q And all -- well, is it fair to say that every single alien who gets deported has an immigration judge order of deportation?
A If not by a judge, then by an immigration official.
Q And every single alien gets deported in custody in your view?
A Unless they self-deport, yes.
Q What is "self-deport"?
A They get -- well, sometimes people get orders to be removed and they say I don't want to deal with it and they just leave. There is no way for us to verify it. We just call them self-deport.
Q Maybe I have to clarify this.
Let's say 10,000 aliens get removed this month. All right?
10,000 aliens have an order of deportation against them before they can be removed.
Is that fair to say?
A They have to have some sort of removal order, yes.
Q Right. So every single alien that gets removed has to

have an order of removal, correct?
A Okay.
Q And every alien who gets removed doesn't have an order of custody, correct?
A I'm not sure if there is an order of custody, but correct.
Q That's not what I'm asking.
If you have 10,000 aliens who get removed --
A I think -- if you're asking me do I believe we if we can facilitate someone's removal if I believe they are in custody? Then, yes.
Q So it's your view that any time you walk someone on to an airplane, they're in custody?
A Yes, because they're not free to leave.
Q Based on an immigration judge's order that they were deported; is that your view?
A Yes.
Q So every single alien would be subject to custody under that view; is that fair to say?
A Under my view, yes.
Q Okay. So it doesn't matter whether headquarters in Washington ICE says this person should be on alternatives to detention if they're going to be removed and you're taking them to an airport, your view is that they are in custody; is that fair to say?

A Yes, they're in custody, they're not in detention.
Q What's the difference?
A Detention, you're behind bars.
If I detain you on the side of the road, you're not free to leave, that's detention. But when I determine, okay, you're not who I'm looking for, custody ends. If I have to sit in an airport while you're leaving the country or if I'm going to the country with you, that's custody.
Q Even if you're on alternative to detention?
A Yes.
Q Even if you're on a release status?
A Yes. If we have to be there, then that's custody.
Q Because you're escorting them?
A Yes.
Q Now, I think you testified -- so you did not -- in preparation for Mr. Mbacke's removal, you didn't see a revocation of release order?
A No, it's not general practice to go through someone's file because some are -- to look at all the paperwork. Generally we go in and look at the comments from the case officer.
Q My question is just did you see a piece of paper that's called a revocation --
A I did not.
Q -- of release?

A I did not on this case.
Q So you answered the email and you said, I'll go to Africa, and you showed up?
A Yes.
Q And you familiarized yourself enough to decide whether -- how comfortable you felt about the level of supervision you were going to give him at the airport; is that fair to say?
A Yes.
Q You felt comfortable enough letting him walk behind you, right?
A Yes.
Q You felt comfortable enough letting him get up and walk around a little bit?
A Yes.
Q You felt comfortable enough when Agent Camaj said go talk to your cousin?
A Yes.
Q You felt comfortable enough letting him go to Gate 20 when you were at Gate 22?
A Yes, it's basically the same area but, yes.
Q All right. So let's talk for a minute about policies.
You said you learned two days ago that there is a policy requiring detainees to be cuffed?
A Not all detainees have to be cuffed.
Q But you -- what was the policy you learned two days ago

then?
A Well, I didn't learn it two days ago, but if you're transporting in a vehicle, whatever, they're supposed to be restrained. But part of our policy is the airlines have final say who gets on board, so I don't know of anyone that's ever had to cuff someone or restrain them with restraints and get on an airplane.
Usually if it comes to restraining them in an airport, you just turn around and leave, you don't even get on the plane.
Q I'm sorry, I didn't understand that. When it comes to restraining them in the airport?
A Yes. If someone starts acting up in the airport to the point you have to put restraints on them, you don't even bother trying to get on the plane. If they're act up in the airport, what's he going to do on an airplane.
Q I see.
Let's talk about airplanes for a minute.
You recognize that there is an ICE policy that requires that personnel assigned to make reservations to transport on a commercial aircraft have to notify the airline prior to taking the detainee to the flight, correct?
A Yes.
Q And, in fact, you also recognize there's a form, a G191 -- G391 that you are supposed to file with the airline

getting their permission to allow you to take a detainee on a flight?
A Yes.
Q And I think you testified that you understood that purpose to be for the protection -- well, the purpose to be because the pilots have the right to refuse?
A Yes.
Q Was any notification made to the airline about Mr. Mbacke?
A I don't make the reservations, but as far as I know, our, we call it "cabling the flight," and that was cabled through to Senegal, as far as I'm aware. I don't -- that is not part of what I do as an officer.
Q Cable through to Senegal?
A Meaning I mean any -- any other country under clearance to transfer through there. And I don't know what the people at made reservations do. That's not part of my job.
Q What was the airline you were using?
A Delta, I believe.
Q Okay. So to your knowledge, did Delta -- was Delta given a G391 prior to the escort of Mr. Mbacke to take him on their airplane?
A I don't know.
Q Now, ICE has the ability to get charter flights for detainees, correct?

A Yes.
Q So if they use a commercial airline, it's with the understanding that they're leaning on the goodwill of the commercial company?
A Yes.
Q And I think you said that the reason that you don't like to handcuff people or to tell the airline because it makes the pilots uneasy?
A Yes, they doesn't like people with belly chains and handcuffs to get on the plane. It makes people uneasy.
Q So you just don't tell them to spare them the uneasiness?
A Tell who?
Q The pilot.
A Oh, no, we let them know. They know. They're aware we're on the flight.
Q Well who on Delta, on the flight that Mr. Mbacke was getting on, knew you were coming on with a detainee?
A The people at the gate. And the pilot should be notified. We have to fill out paperwork.
Q Were the pilots notified in this case?
A I don't have any idea.
Q In any case that you've done, any of your deportations, did you make sure the pilot got notified?
A A hundred percent of the ones I actually made it on the plane for, I always peek my head in the cockpit, tell them

we're on the plane, tell them we're in the back, and they always seem aware of it.

Q You didn't tell -- well, you didn't get on plane on this one?

A Correct.

Q Did you file a G399 with the airline?

A That is not something I do on my job.

Q So you're saying if you sit in the cockpit you tell them when you're boarding?

A Yes.

Q But the regular -- or the policy requires that they be told in the advance, before, at least a day in advance; does it not?

A When we get on a plane -- I don't know what our reservation people do. When we get our tickets, we tell them why we're sitting all the way in the back, who we're sitting with. We show them that we have his travel documents. He's in our custody.

When we get on the plane, like when I flew from Detroit to JFK, we -- he was aware of it, because we told him at the ticket the counter.

Q Told who?

A I told the ticketing agents at the ticket counter. They tell the people at the gate. The gate tells the flight crew when they get on.

Now, as far as the 391 the day before, that's not part of what I do.
Q But the policy, at least on foreign flights, detainees are supposed to be in restraining devices.
A What was?
Q Is it the policy on foreign flights that detainees are supposed to be in restraining devices?
A Not that I have read.
Q So I'm confused. What was the policy that you learned about two days ago that you didn't know before? And you testified about on direct?
A I testified that I've read it two days ago, but I've read that policy about nine years ago, when I got out of academy.
Q What policy is that that you're talking about?
A The escort policy and the restraint policy.
Q Which is what in your mind? What is the restraint policy in your mind?
A If we're talking about this instance, that since the --
Q Well, not in this instance, what I want to know is in your mind, what is the policy that you should be following about restraints of detainees?
A It's a rather long policy. You want me going over transporting in a van, in a car?
Q And on airplane.
A This incident.

Q Yes.
A When we take them out of the car, or even sometimes when they're still in the car, we discreetly take their cuffs off, because we know that if we go to walk through an airport with someone in handcuffs, mind you we're not armed, we don't have any protective body armor on, we're basically announcing to the world that we're in law enforcement. We're embarrassing the person being removed.
Then we get to the gate, people start looking at it, see a guy there in restraints, they get uneasy. Generally, that means the pilot's going to say, look, no, I'm sorry.
As far as I know, the entire time I have had this job, no one has to put an international escort on a plane in restraints.
Q The purpose -- well, the reason for that then being, if I'm understanding right, you don't want to make people uneasy --
A Correct.
Q -- right?
But the fact is, in your mind, they're in custody, correct?
A Yes.
Q So being in handcuffs would be straightforward with respect to their understanding of what their situation is.
Would you agree with that?

A Okay.
Q So what did you do to advise Mr. Mbacke that even though you don't have handcuffs and you can walk around, you are in custody?
A I've never had to tell anybody that they're in custody. It's never happened. So...
Q All right. So why did you volunteer to do this job? The Africa trip?
A It's overtime.
Q And you had very little interaction with Mr. Mbacke while you were at the airport; would that be fair to say?
A That's correct.
Q You didn't sit with him in the airplane --
A No.
Q -- from Detroit?
A Correct.
Q From what I can tell from the videos, you really never exchanged words with him?
A Not when I talked to him very, very briefly.
Q You didn't hear him asking him to speak to his family, correct?
A Oh, yes, yes.
Q He wanted to tell them that this was happening, right?
A Okay. He never said why, he just said, Hey, can I use the phone?

Q You didn't hear him complaining that he hadn't had a chance to tell his family he was being deported?
A Yeah, he complaining about some things, about not having much property going back and not knowing anybody to Senegal, and things like that.
Q When you did your other deportations, what kind of warning did you give the deportees or did they have prior to being deported?
A As far as I can remember, pretty much did it the same way did this one.
Q Did you ever give anyone like a baggage notice and give them some advance warnings of and when their deportation would be?
A No, that wouldn't have been my job. I wouldn't have been the case officer. I would just show up at airport.
Q So whose job would that be?
A Usually the case agent. I've never had -- the ones that I've done verified departures for, I have brought them in and explained what the situation is and what the protocol is.
Q In advance, so they can prepare for the deportation?
A For those that are on ATD, yes, alternatives to detention.
Q And who would have had the obligation to tell Mr. Mbacke, who was in immigration detention at Calhoun jail, when he was going to be deported?

A There's an officer that works in the Calhoun jail, a deportation officer. She could have done it. Case agents could have done it.
Q But to your knowledge, you have no information that anybody did that, correct?
A Not to my knowledge.
Q And it appears that on March 27th, that was the first he learned he was being deported that day, right?
A I would have no idea.
Q Mr. Mbacke, you said he didn't eat at Buffalo Wild Wings.
A No, we offered to buy him food. He said, no.
Q Who offered to buy him food?
A I think I said it. I think -- we'll buy you food, if you're hungry.

On all the escorts I've ever done, if a person doesn't have money, I'm not going to sit there and eat in front of them, I usually offer to buy food.
Q At what point did you remember offering to buy him food? That was when you were sitting down at Buffalo Wild Wings?
A No, we were probably walking. I can't remember exactly what I said to him. But I would never say, Hey, we're going to go eat, have fun watching. I would have said either on the way there -- I remember asking him, Are you sure you don't want anything? He said No.
Q And he did not have any money on him, correct?

A As far as I'm aware.
Q Didn't Officer Camaj take him to an ATM?
A I think he tried maybe. I think he tried using a card. I vaguely remember that.
Q Were you at ATM when that happened?
A Yes.
Q You were standing there?
A Yes, I was standing there; yes.
Q And Officer Camaj was standing there as well?
A That would be my guess.
I can't recall if he was standing there. I do remember going to a ATM, now that you mention it. It's not something that came up.
Q But you remembered Mr. Mbacke having some sort of card at the ATM?
A Yes. I do believe he tried the card.
Q So he didn't have any money on him?
A As far as I'm aware.
Q And you don't know what that card was?
A No idea.
Q And he didn't have any other property on him, correct?
A As far as I'm aware.
Q Whatever he had at the Calhoun County immigration detention wasn't on him --
A No, he had stuff that we checked for checked baggage.

There wasn't much.
Q And I think you testified that when you heard Officer Camaj discussing the cousin with him, that you heard Officer Camaj give him permission to go to sit with somebody else, right?
A Yes.
Q And you said that you thought that was about 30 yards away, correct?
A I was estimating, but maybe, yeah.
Q And you did write a report on March 29th with respect to this case, correct?
A Yes.
Q Two days after the incident?
A Yes.
Q And in that report you said that he was seated at that point ten rows of seats away?
A Approximately ten rows, yes.
Q And you also testified that -- well, withdrawn.
Did you and Officer Camaj -- when you filed your report on March 29th, had you and Officer Camaj and Lassiter discussed what you would say?
A Not what we would say, no. Not in our reports, no.
We talked about the incident, obviously. But we weren't saying only write this or that.
MS. ROSTAL: Let me take just a moment, Judge.

(Pause.)

(Continued on next page.)

CROSS EXAMINATION
BY MS. ROSTAL: (Continued)
Q Did you have anything to do with his checked baggage?
A I might have helped carry it. If I moved it, I can't remember. Didn't -- I remember we kind of looked at it, to make sure there's nothing dangerous in there, and that's about it.
Q And who took the baggage receipt form?
A I cannot remember.
MS. ROSTAL: Thank you.
MR. ALGOR: I just have a handful of questions, Your Honor.
THE COURT: Go ahead.
MR. ALGOR: Thank you.
REDIRECT EXAMINATION
BY MR. ALGOR:
Q Officer Hall, you were asked some questions about when -- your time in the B22 waiting area --
A Yes.
Q -- when the defendant asked permission to see his cousin?
A Yes.
Q Were there any other times when the defendant asked permission to do something or go somewhere?
A I remember he asked to use the restroom and he asked to use the phone.

Q Did he ever ask to -- permission to go somewhere when you guys were sitting at Buffalo Wild Wings?
A Yeah, he got up and went and walked around and came back later with a coffee with Officer Lassiter.
Q So every time the defendant wanted to do something, he asked permission of you, is that right, or one of the officers?
A Yes.
Q And why?

MS. ROSTAL: Objection.

THE COURT: Sustained.

MR. ALGOR: Nothing further, Your Honor.

THE COURT: Any recross?

MS. ROSTAL: No, Your Honor.

THE COURT: Thank you, Officer Hall. You may step down.

THE WITNESS: Thank you.

(Witness steps down.)

THE COURT: Ladies and gentlemen, at this point, I would contemplate us taking our lunch break and having you return at -- and we're going to have everybody return at 1:45 because there's some issues I need to deal with with the parties.

Thank you.

All rise, please.

(Jury exits.)

THE COURT: Okay. Please be seated. Let me ask first, how many other witnesses does the Government have prepared for today?

MR. ALGOR: Three, Your Honor.

THE COURT: All right. So what are the evidentiary issues that we can take care of in advance of the witnesses testifying?

MR. CAMPOS: Your Honor, I'm just going to tell the witnesses that are waiting that they should be back.

THE COURT: Absolutely. Thank you.

MR. ALGOR: Your Honor, the two exhibits that I understand the defense has objections to are redactions in Government Exhibit 1, as well as the admissibility of Government Exhibit 15.

MS. ROSTAL: And there's also something on 6.

THE COURT: The parties have, that I can look at, copies of the proposed redactions?

MR. ALGOR: Yes, Your Honor.

(Short pause.)

MR. ALGOR: (Handing.)

THE COURT: Okay. Just let's take these one at a time. For Government's Exhibit 1, what is it? I take it the defense would like additional redactions?

MS. ROSTAL: Yes. One on that exhibit on page 2.

THE COURT: Okay.

MS. ROSTAL: At the bottom, this is the notice to appear, and the bottom has a certificate of service signed by an officer, and this would have been back in 2013 --

MR. ALGOR: '15.

MS. ROSTAL: And where it says signature of respondent, it says refused to sign, so my position is that -- first of all, that's hearsay. There's a confrontation cause problem, if that went in. It's not relevant to any issues in the case.

THE COURT: Hold on for a moment.

Why does the Government need this?

MR. ALGOR: The document, Your Honor, or the signature?

THE COURT: That even the certificate of service.

MR. ALGOR: Well, it's part of the whole document, Your Honor, so --

THE COURT: I understand, but --

MR. ALGOR: And to show that the defendant was served with it on April 19th -- or April 9th of 2015.

THE COURT: Okay. And what's the objection to redacting both signatures?

MR. ALGOR: We're fine with that, Your Honor, as long as we can keep at least the service in there to show that it was served on that date.

THE COURT: Certainly. I would just be -- I think the issue is --

MR. ALGOR: Your Honor, it wouldn't be the -- I can understand the refuse to sign, but the signature of the agent, I don't know why that would need to be --

THE COURT: Well, that's the point, though. It draws -- if both signatures are redacted, right, it points out that -- it suggests to the jury that we're redacting personally identifying information; namely, signatures. If you just redact the defendant's signature and leave the officer's signature, it suggests the implication that we're trying to get around here which is there's something to the absence of the signature by the defendant, which I don't think is really relevant to anything.

MR. ALGOR: Yes, Your Honor.

THE COURT: I don't think it's probative of anything to say that the officer signed it. Is this person even testifying?

MR. ALGOR: No, Your Honor.

THE COURT: Okay. You can submit Government's Exhibit 1 with the signatures on page 2 redacted.

The next is Government's Exhibit 6?

MS. ROSTAL: The next is Government's Exhibit 6, and the Government has put -- included in this -- this is the removal packet, and included in that several copies of what

appear to be Senegalese birth certificates. I don't know how they got these, I don't know who gave them to them, but I'm concerned of the prejudice of the fact that there appears to be different dates of birth; one is 1990 and one is 1986. So I would propose redacting the dates of -- just the year of the date of birth in order to dispel any prejudicial suggestion about the defendant's credibility when, in fact, it's not clear who prepared these documents.

MR. ALGOR: Your Honor, we have no objection. That -- I didn't even know that was the reason. I thought she was going to be erasing the three pages that we already redacted based on Your Honor's order regarding the defendant's criminal history.

THE COURT: Is that the only issue with 6?

MS. ROSTAL: Yes.

THE COURT: Okay, I think we have resolution on 6.

MR. ALGOR: Yes, Your Honor.

THE COURT: Now, the next one is 15?

MR. ALGOR: Yes, Your Honor.

THE COURT: Ms. Rostal.

MS. ROSTAL: So 15 is the detainer and Mr. Wheeler here has filed a notice of appearance, Your Honor, he's the immigration specialist, and if -- with the Court's permission, I would let him address the sort of significance legally of an order of detainer. Our position is that it's not relevant to

the issues in this case regarding custody.

THE COURT: Well, before we get into that, is this being introduced to a witness today?

MR. ALGOR: Yes, Your Honor.

THE COURT: Okay.

MR. ALGOR: Officer Lassiter, who is one of the three deportation officers that removed the defendant, he's the signing -- the signature of the immigration officer on this detainer.

THE COURT: Okay, and what's the purpose for which it's being offered?

MR. ALGOR: Your Honor, the immigration detainer was in place once the defendant was arrested in 2017, and then once that -- once he came off -- once he was acquitted of those charges, that's when the revocation of a release was introduced, and so this is part and parcel of why the revocation of release occurred.

MS. ROSTAL: Wait. The detainer is part and parcel of -- the revocation of release speaks for itself. This is Government's Exhibit --

THE COURT: Well, looking -- looking at the revocation of release, right, which is --

MS. ROSTAL: Government's Exhibit 5.

THE COURT: Yes. Government 5, not in evidence yet, it says failure to provide Senegal travel document.

MR. ALGOR: Yes, Your Honor.

THE COURT: What's the connection between this document and the detainer document?

MR. ALGOR: Well, Your Honor, that's why, once they transfer it, it was based off this detainer. When he got transferred from custody from this state to ICE -- to ICE. So they are arguing that he was -- they are arguing the custody issue and this detainer was the reason, once he came off the state custody, that he then was picked up by ICE.

THE COURT: Okay. I understand the purpose why it's being offered.

Go ahead.

MR. WHEELER: Your Honor, the detainer has a very specific function. It's a request from DHS to a criminal custodian -- a request that the criminal custodian hold someone 48 hours beyond when they would otherwise be released so that DHS may assume custody. What authority DHS has to assume custody has nothing to do with the detainer. The detainer is directed at -- it's not --

THE COURT: Look, I understand that very well. I know what a detainer is and the case law is quite clear. The detainer is a request to either an agency or an authority and what that agency or authority does with the request is up to that agency or authority's state, local or federal, but you are making a legal argument as to why this (indicating) is not

legal authority to establish custody under the statute; am I wrong about that?

MR. WHEELER: Well, it depends what the Government's argument is, but if the question at trial were was he in lawful custody for 48 hours after his acquittal on the state charge, the detainer would be relevant because his custody by the state for those first 48 hours would have been pursuant to this request. Thereafter, when ICE took custody of him, the detainer had lived its life. It's utterly irrelevant to whether when he was in DHS custody there was lawful authority for DHS to have him in custody, so it's not -- it's not even a relevant part of the story.

THE COURT: Well, let's be clear. In the cross-examination of the last witness, the defense opened the door to where Mr. Mbacke was prior to ICE custody, quote/unquote, or prior to ICE receiving the defendant, okay? There were questions asked about the Detroit Detention Center, and under what conditions the defendant was received by federal officials. They are offering the document solely for the purpose of or for the relevant purpose of establishing how ICE happened to get hold of Mr. Mbacke.

Now, it may be that you don't think that that's custody or this has no legal event, but it is certainly, in light of the factual issues opened on cross, relevant. And so whatever objection there is has been waived by that whole line

of questioning which went on about -- I think it was called the Calhoun facility or the --

MS. ROSTAL: Right, but that was immigration custody. He was taken into immigration custody in January and held in immigration custody until his deportation on March 27th, so that was immigration custody. That's what I was questioning about. So the witness --

THE COURT: I understand, okay. Okay, I misspoke then. So the questions on cross were what happened in 2018, not what --

MS. ROSTAL: Right.

THE COURT: -- not what happened in 2017.

MS. ROSTAL: Right. Calhoun is the immigration --

THE COURT: Is a federal immigration --

MS. ROSTAL: I wasn't asking about when he was in on the other charge, the local charge.

THE COURT: Okay. Why does the Government need this document?

MR. ALGOR: Your Honor, why would the -- we're arguing the custody and how he came into the custody of ICE. This is -- the detainer was lodged. Once he came off of that acquittal, then this detainer came in effect and then he was arrested by ICE and taken into ICE custody.

MS. ROSTAL: For 48 hours.

MR. WHEELER: But, Your Honor, the 48 hours during

which the detainer had any effect at all were 48 hours prior to his being in ICE custody. If they came in and got him at the moment that he was released, there was never a time when the detainer was justifying his custody by anyone, and if there was a gap between when he was released --

THE COURT: Well, that's a legal argument.

MR. WHEELER: It goes to relevance. If there was a gap between when he was released based on the acquittal and when DHS got him, the detainer governed his custody during that period, but as soon as DHS had him, the detainer had lived its life. So if the Government is saying we need the detainer in to show that DHS had the authority to take him into custody, that's not what -- the detainer didn't give DHS authority to take him into custody. The detainer gave the jail authority to hold him until DHS took him into custody.

MR. ALGOR: Your Honor, at every turn, the defense has used these means saying that the notification -- the revocation of release is a sham document, that the -- that it was a back door deportation -- I think that was the line that was used in the opening statement. And so, if they are conceding the fact that he was in ICE custody as part of the revocation of release, then I don't have to introduce this, but it seems like the defense is partly then that he wasn't -- that that revocation of release is not -- had not put him into ICE custody.

THE COURT: Let me back up for a second. Maybe I misunderstand. This is a document from 2017.

MR. ALGOR: Yes, Your Honor.

THE COURT: Right. So in 2017, Mr. Mbacke was acquitted --

MR. ALGOR: No, in 2017, he was charged.

THE COURT: He was charged. What happens in April?

MR. ALGOR: In April of what year?

THE COURT: This is dated April 18th, 2017. What happens --

MR. ALGOR: That's when he's charged.

THE COURT: Okay. And so the detainer is lodged so that after whatever he is being held on for by the Detroit Detention Center, says, well you have then -- we would like you to hold -- it's a request. We would like you to hold him for 48 hours after whatever date he's subject to release; is that right?

MR. ALGOR: Yes, Your Honor.

THE COURT: Okay. So when is that event?

MR. ALGOR: This is -- I can have that in a second, Your Honor.

(Short pause.)

THE COURT: While you are looking for that, why does it matter to the defendant whether this document is in or not?

MS. ROSTAL: It's prejudicial, Your Honor, because

of the date, because April 2017 predated all of the events that start with the January 26th, 2018 revocation of release. So it suggests to the jury that there was another charge and -- which the witness volunteered on the stand. I was asking very pointed questions about things that postdated the -- the detention that postdated the January 26, 2018 revocation. Anything prior to that would be --

THE COURT: Well, certainly the order of removal is dated in 2015, so we are not operating under a situation where all events prior to 2017 or 2018 are irrelevant or necessarily prejudicial, as it were, to your point.

MR. WHEELER: If I may, Your Honor, all over the detainer, it is manifest that this is directed from DHS to a separate government custodian, so the other thing that makes it prejudicial is that this is clearly DHS telling someone else who has Mr. Mbacke in some form of custody, don't let him go until we come get him, and that implicates all of the concerns of -- tied up in our motions in limine with regard to his criminal custody between April of 2017 and January of 2018.

MR. ALGOR: Your Honor, just to answer your question, January 26th is when he was transferred from state custody to ICE custody, which is the same day as the revocation of release.

THE COURT: On the basis of -- and so, again, why do

you need the detainer? Because if you are -- if the point is, right, you have some witness who is going to testify that Mr. Mbacke entered whether it's a federal facility or what you allege is federal custody in January, and they did it -- and he entered federal custody pursuant to the revocation order, why do you need the detainer, which -- I'm not sure I share all of the -- or any of the prejudice arguments, which can also be solved by redaction, but there is the threshold relevance question, right? Unless you are trying to make some argument that I'm unaware of, why is it -- I thought you were trying to use it as -- when I misapprehended the date, to explain the course of events under which Mr. Mbacke came into federal custody. Now -- so, go ahead.

MR. ALGOR: Your Honor, it also explains why the defendant is no longer on supervision, that -- in the timeline of events as well.

THE COURT: Where is that?

MR. ALGOR: Well, no, I'm saying in the -- if they are going to raise that he was on supervision up until the time of ICE -- ICE's revocation of release.

THE COURT: Well, I don't know if the detainer -- I mean, look, they may open the door to that, but I'm not sure the detainer document has anything to do with that, right? That may be them opening -- you know, if they say, look, they make the implication Mr. Mbacke was out free in the world, you

know, not in any custody at all, that may open the door to where he was, right?

MR. ALGOR: Yes, Your Honor.

THE COURT: But the question is, why does the detainer document help one way or the other any of that before the door has been opened?

MR. ALGOR: Well, at this point, Your Honor, I will plan on introducing the revocation of release as when he comes into ICE custody, and if they were to open the door, I --

THE COURT: You can renew -- if they were to open the door, you can renew any application with respect to 15. I'm not sure 15 is the document that -- it may be the document, but we will reach that issue when we get to it.

And I take it that you are not relying on the detainer as the basis for the legal authorization for -- of custody that we were talking about yesterday?

MR. ALGOR: No, Your Honor. The revocation of release.

THE COURT: The revocation of release is what the Government is relying on?

MR. ALGOR: Yes, Your Honor.

THE COURT: Because, yesterday, you mentioned that you would be relying on the detainer and so I take it this would be that document?

MR. ALGOR: Yes, Your Honor. The detainer led to

the revocation of release.

THE COURT: Okay. But when you say "led to," only sequence of time, not in a causal way, because the revocation was, at least from the face of the document, for failure to have a Senegal travel document, whatever that means.

MR. ALGOR: That's correct.

THE COURT: Okay. So for now, 15 isn't being introduced by the Government and we will reserve on whatever happens with the evidence.

Anything else?

MR. ALGOR: Nothing from the Government, Your Honor.

MS. ROSTAL: No, Your Honor.

THE COURT: All right, have a nice lunch. See you in one hour.

(Continued on the following page.)

AFTERNOON SESSION

(In open court.)

(Parties present.)

THE COURT: I understand that Mr. Mbacke may have not had an opportunity to eat his lunch.

MS. ROSTAL: Right.

THE COURT: I'm happy to give him a few minutes or if he's, you know...

MS. ROSTAL: He's tough. I'm sure he'll be fine.

THE COURT: Fine.

MS. ROSTAL: He can take a few bites.

THE COURT: And have him take a few bites and then bring him in.

MS. ROSTAL: Very good.

(A brief pause in the proceedings was held.)

(Defendant enters the courtroom at 1:50 p.m.)

COURTROOM DEPUTY: All rise.

(Jury enters courtroom at 1:53 p.m.)

THE COURT: Okay. Please be seated.

Good afternoon, ladies and gentlemen, I hope you enjoyed your lunch. At this point, the Government will call its next witness.

MR. ALGOR: You thank you, your Honor. The Government calls Deportation Officer Joseph Camaj.

(Witness takes the witness stand.)

COURTROOM DEPUTY: Can you state your name for the record and spell your name for the court reporter.

THE WITNESS: Joseph Camaj. C-a-m-a-j.

COURTROOM DEPUTY: Please raise your right hand.

**JOSEPH CAMAJ**, called by the Government, having been first duly sworn, was examined and testified as follows:

THE WITNESS: Yes.

COURTROOM DEPUTY: Have a seat and just speak into the mic.

DIRECT EXAMINATION

BY MR. ALGOR:

Q Good afternoon.

A Good afternoon.

Q Who do you work for?

A Department of Homeland Security, Immigration and Customs Enforcement, Enforcement and Removal Operations.

Q How long have you worked for Homeland Security, Immigration and Customs Enforcement?

A Since September of 2006.

Q What is your title?

A I'm a deportation officer.

Q Have you had that title the entire time you've worked for ICE?

A No.

Q What other titles have you held?

A Immigration Enforcement Agent.
Q Where do you physically work?
A Detroit, Michigan.
Q Are you a member of a specific team?
A I'm currently on the Non-Detained Docket/ATD program which is an Alternative to Detention Program.
Q How long have you been a member of the Non-Detained Docket and Alternative to Detention Program?
A This last rotation, possibly, two years because we rotate through the dockets. And so, I've been on it before but this last time, approximately, two years.
Q What are your job responsibilities as a deportation officer in the Non-Detained/Alternative to Detention Program?
A Primarily, to remove individuals from the United States who have been issued a final order of removal by an immigration judge.
Q How many times have you removed someone pursuant to an order of removal?
A Many.
Q What do you mean by many? How many?
A Dozens.
Q When was the last time you removed an individual who is being removed pursuant to an immigration judge's order?
A I believe March of this year.
Q And do you recall what country that was it?

A Nigeria.
Q Does ICE have a policy regarding whether an individual being moved from the United States should be handcuffed?
A They have handcuffing policies.
Q When escorting someone being removed from the United States in the dozens of times that you have done so, how many times have you handcuffed that person?
A I can recall one.
Q Can you explain why in that one instance?
A This particular individual had been -- the agency had attempted numerous times to remove him from the United States and he fought every time he resisted.
Q Officer Camaj, I now want to turn your attention to March 27th of this year.
Were you working that day?
A Yes.
Q What were you assigned to do that day?
A Escort an individual back to Senegal.
Q How did you get assigned to that task?
A They solicited for escorting officers and I volunteered for it.
Q Now, I want two turn your attention to about 10:00 a.m. on March 27th. Where were you?
A At Detroit Metro Airport.
Q And why were you there?

A Awaiting the arrival of an individual that we were going to escort back to Senegal.
Q And after arriving at the airport, what did you do next?
A We waited on the curb, curbside, for two other officers to bring the individual to the curbside and hand him over to us so that we can continue on with the removal.
Q Would you recognize the individual that you were removing on March 27th if you saw him?
A Yes.
Q Do you see him in the courtroom today?
A Yes.
Q Could you please point to him and indicate an article of clothing that he is wearing?
A He's got a white shirt on.
MR. ALGOR: Your Honor, the witness has indicated the defendant.
THE COURT: The Court notes that the witness has identified Mr. Mbacke.
Q Was the defendant in handcuffs when he arrived at the airport?
A Yes.
Q Once the defendant and the officers arrived at Detroit Airport, what happened next?
A They removed the handcuffs from him and they turned him over to us, the escorting officers.

Q Did they provide anything else to you when they turned him over?
A A removal packet.
Q What is a removal packet?
A A removal packet is the packet that the agency prepares for the individual's removal from the United States?
Q And who was in charge of the removal packet for the defendant?
A When they handed it to us?
Q Yes.
A Or who accepted it?
Q Who accepted it?
A I accepted it.
Q Once you received the defendant and the removal packet what did you do?
A We continued on to the check-in counter.
Q And once you checked in there, what did you do next?
A We continued on to the assigned gate for departure.
Q In the Detroit Airport, while you're walking to the boarding gate, was an officer with the defendant the entire time?
A Yes.
Q At approximately what time did you depart Detroit?
A Approximately 3:30 p.m.
Q And what was the destination from your flight from

Detroit?
A From Detroit, it was to JFK.
Q And while on the flight from Detroit to JFK, where did you sit?
A At the end of the plane.
Q And can you describe where the other officers and the defendant were sitting in relation to you?
A In the very last row was the defendant, one of the escorting officers next to him, the escorting officer next to that officer, and the third escorting officer in front of him which would be me.
Q Is there a reason why you all sat together on that flight?
A We sit together at the end of the plane with the individual being escorted foreign on every flight.
Q At approximately what time did you land at JFK Airport?
A Approximately 5:15 p.m.
Q And what terminal did you arrive at?
A Terminal 4.
Q Do you recall what date you arrived at JFK on March 27th?
A B47.
Q Once you arrived at Terminal 4, what did you do next?
A I approached one of the gate agents and showed them the itinerary and expressed to them that we were officers and we were traveling onward and showed them itinerary to see what

was the next gate that we had to go to to continue on.
Q And what gate was that?
A B22.
Q And so, once you learned that B22 is your departure gate, what did you do?
A We continued on to B22.
Q Do you recall how long it took you to get from B47 to B22?
A Approximately a half hour.
Q While you walked from B47 to B22, where was the defendant?
A With us.
Q Once you arrived at the departure gate, what happened next?
A We approached the gate and the agent at the gate told us that it was too early to work on seat assignments and to come back closer towards the departure time.
Q Why would you need to arrange seat assignments at that time?
A Again, to make sure that we're all sitting towards the end of the plane together with the defendant.
Q What did you do once you learned that you couldn't arrange your seating assignments?
A We went to go get a bite to eat.
Q And where was that?

A Buffalo Wild Wings.
Q While at Buffalo Wild Wings who, if anyone, ate?
A I did and Officer Hall did.
Q And where was the defendant while you were at the restaurant?
A With us.
Q By "with us," what do you mean by that?
A We were all sitting around the tables. I believe the tables were small so there are two tables touching. Two of us are sitting on one side and two of us are sitting on the other side.
Q Did there come a point in time where the defendant left the restaurant?
A Yes.
Q And who did he leave with if anyone?
A Officer Lassiter.
Q Did you see where the defendant and Officer Lassiter went?
A I didn't see specifically, but he had expressed that he wanted to stretch out and walk around a little bit.
Q Approximately, what time did you finish your dinner at Buffalo Wild Wings?
A I'm not sure.
Q Once you did finish your dinner, what did you do next?
A We continued back to the gate area.

Q And what gate is that?
A B22.
Q Once you arrived at B22, what did you do next?
A We sat in the seats at the gate area.
Q Can you explain to the jury where you sat and the other officers and defendant sat?
A Okay. We were coming from the area of Buffalo Wild Wings, and so when we were coming towards the gate the counter by the gate is to the left. And so, there are seats right there. And so, we walked around and sat at the seats adjacent to the counter. And so, when we sat Hall and Lassiter sat down with the defendant between them and I sat right across facing them.
Q Approximately how far were you from the defendant at this time?
A Possibly five feet.
Q While in the waiting area of B22 what, if anything, was the defendant doing?
A He was on the phone.
Q Did the defendant bring a phone with him to the airport?
A No.
Q Do you recall whose phone he used?
A He used Officer Lassiter's phone.
Q How long was the defendant on Officer Lassiter's phone?
A Minutes.

Q Did you hear anything that the defendant said on Officer Lassiter's phone?
A No.
Q While the defendant was on Officer Lassiter's phone, what were you doing?
A Just sitting in the area waiting with them for the time to come to work on the seat assignments and continue on.
Q Do you recall a time when the defendant got up with Officer Lassiter in the waiting area?
A Yes.
Q And do you know why they got up?
A I think it was to use the bathroom.
Q Did you see Officer Lassiter and the defendant leave the waiting area?
A Yes.
Q Okay. And do you recall when Officer Lassiter and the defendant returned to the waiting area?
A Yes.
Q I want to turn your attention now to, approximately, 8:15 p.m. on March 27th of this year. Where were you located in Terminal 4?
A At Gate B22.
Q Where was the defendant at this time?
A With us.
Q What, if anything, happened at that time?

A He got up and walked to the left of me onward up to the left of me and I stopped him and I asked him where are you going? And he said to me, he said, 'I see my cousin over there that I lived with when I first moved to New York City." And he told me that Lassiter gave him permission to go talk to his cousin.
Q Did you say anything in response to the defendant's statement about his cousin?
A I expressed that that was a good thing for him that he sees somebody because, earlier, during the process, he was concerned and expressing concern about how he's going to go to Senegal and he's not going to know anybody there. So when he was telling me that he sees somebody in the boarding area of the flight that we're leaving on, and this is somebody that he lived with when he first came to New York, then that's perfect. The guy that helped you when you first came to New York you have somebody to help you when you go to Senegal.
Q Approximately how far was the defendant once he went to meet with his cousin?
A 8 to 10 rows.
Q Once the defendant was approximately 8 to 10 rows away, what did you do?
A I continued sitting in my seat.
Q Did you ever look at the defendant during that time?
A I look over a few times.

Q What happened next?
A We were waiting there. The time came where it was closer to working on the seat assignments. Officer Hall got in the line for the seat assignments, and one of the gate agents came over and handed something to Officer Lassiter who was sitting in front of me across from me. And I asked him what that was and he said, "These are the boarding passes." Okay. So we got up, I took the boarding passes, and I shared the information with Hall that, hey, they fixed the boarding passes, they gave them to Lassiter and we turned around and the defendant wasn't there.
Q And where were you in the gate area when you realized the defendant wasn't there?
A At the boarding area for B22.
Q Once you realized the defendant was no longer in the gate area, what did you do?
A We began looking for him.
Q And in what area of JFK did you look far him?
A In the seating area adjacent to wherever the seat -- whatever the, like, checking maybe he's not bathroom, et cetera. And then we split up and I went down the hall that we had originally come down.
Q And so, when you said you went down the hall are you referring to the walkway from B47 to B22?
A Yes.

Q And what was the result of that search?
A We finally all met up back at Gate B22 and we knew that he was gone.
Q Once you realized the defendant was gone, what did you do?
A I immediately called my supervisor and informed my supervisor.
Q And what did you tell your supervisor?
A That he escaped, the defendant escaped.
Q Do you recall approximately how long after you realized that the defendant had escaped that you contact your supervisor?
A From the moment that he was not in our sight, and until the moment that I called the supervisor, it was approximately a half hour.
Q As part of your search for the defendant, did you make any phone calls to the other officers?
A I called one of our officers back in Detroit hoping that maybe he had points of contact for the defendant and might know where the defendant would be, who he would be talking to, et cetera.
Q Who was that officer that you spoke with?
A Officer Higgins. I apologize, I called because you said "spoke to." I never got a chance -- I didn't get him on the phone, he wouldn't answer.

Q Did you call any other officers back in Detroit?
A Officer Whalen the supervisor.
Q What did Officer Whalen tell you?
A Officer Whalen said, "Did you contact Port Authority?" "No, but I'll do that right now." And I turned over to the gate agent and I asked him, can you please put me in contact with the Port Authority. And the gate agent called Port Authority on the gate phone and handed the phone to me and I reported what was going on to Port Authority.
Q Why didn't you call the Port Authority when you realized the defendant had escaped?
A We're federal officers. He's in our custody, we're responsible for him, he's missing. I called my supervisor to tell my supervisor.
Q Once you were back at the gate area and you had spoken to Port Authority, what can you did you do?
A While we were at the gate area and Port Authority was there, many different entities came together to help look for this -- for the defendant. And then, at one point, they got the information that he was seen on camera footage leaving the airport.
Q Once you learned -- and did you do review any of that surveillance footage?
A Once they confirmed that, that they have him leaving the airport, then Port Authority went about their way and the rest

of us that were now left went to look for him and find him continued on over to a command center that CPB has at JFK to review the footage.

Q And so, did you review any surveillance footage at the command center?

A Yes. We were -- a bunch of the officers that were in the area that we were all collectively went to the command center with the CBP officers that were also there reviewed the footage in the CBP command center.

Q What did you do see?

A I saw him running through the airport frantically looking one way and another on which way to get out. And then I saw him running out to the drop off area where people are departing and running up to a cab and entering the cab and driving off.

Q Once you reviewed the surveillance footage in the command center what happened next?

A We, the officers that were assigned to come and assist, continued on to look for him. We were taken back to a hotel that they had made a reservation for us to stay at because we couldn't go out with them to look for him because we didn't have the proper gear that we need: We didn't have our vests, we didn't have our guns. So we happened to stand back while they continued searching for this individual that ran from us.

MR. ALGOR: Your Honor, may I approach.

THE COURT: Yes.

(Approaching the witness.)

(Handing to the witness.)

Q I just handed you what's been remarked for identification as Government Exhibit 6.

Can you look at the document, please?

A Yes.

Q Do you recognize this exhibit?

A Yes.

Q What do you recognize it to be?

A This is the removal packet.

Q And how do you recognize -- and whose removal packet is it?

A By looking at this right here, this is the removal packet envelope that we use and then the first page after it is the travel document issued for Mbacke to return to Senegal.

Q And how do you recognize that that's the removal packet for the defendant?

A It's him on the travel document.

Q Is Government Exhibit 6-A fair and accurate copy of the original removal packet?

A Yes.

MR. ALGOR: Your Honor, the Government moves to admit Government Exhibit 6 into evidence.

MS. ROSTAL: No objection.

THE COURT: Is this the version as we discussed during the break.

MR. ALGOR: Yes, your Honor.

THE COURT: Okay. Government Exhibit 6 is entered into evidence and you may proceed.

(Government's Exhibit 6 was received in evidence as of this date.)

MR. ALGOR: Thank you, your Honor. And Mr. Manson if I can have the -- thank you.

Q Officer Camaj, I'm turning your attention now to the second page of Government Exhibit 6.

What is this document?

A This is the travel document issued for Mbacke's removal from the United States to Senegal.

Q And I want to turn your attention to the date of this document.

Do you see that?

A On the bottom right corner, leaving New York on March 23, 2018.

Q Now, turning to the next page. What is this document?

A This is the warrant of removal.

Q Okay. And what are some of the reasons why a warrant of removal might be issued?

A This is issued to document who issued the final order. And then, on the second page of it, because it's a 205,

warrant of removal, and a 205 consists of two pages. And then, on the second page, is where we would document his departure from the United States, send the 205 back to the file, and the case is closed that he departed.

Q I just want to stay on this page specifically for a second.

What is the reason for -- and who is this warrant of removal for?

A The defendant.

Q Okay. And if you could tell us what the reason for the warrant of removal is for the defendant?

A The warrant of removal, the reason for it is to document the final order of removal issued by an immigration judge.

Q And there is a line and pursuant to the following provision of the immigration and nationality act. Do you see that?

A Yes.

Q What do those numbers underneath represent?

A Those are the number of codes from the INA of law that he violated.

Q I want to turn your attention next to the second page of that notice of warrant that you were describing.

Can you please explain to the jury what this portion of the notice is for?

A This portion is for him to fingerprint and sign.

Fingerprint in the box to the right of his picture where it says "right index fingerprint." And then underneath it, it would say signature of alien being fingerprinted.

Q And who fills out this portion of the warrant?

A Any one of officers can do the fingerprint and sign as the fingerprinter. And then departure witnessed by any one of the officers. When I have it, I usually get all the officers to sign it.

(Continued on the next page.)

DIRECT EXAMINATION

BY MR. ALGOR: (Continued)

Q And when is this executed?

A When he was removed from the United States.

Q Do you see your signature on there?

A Yes.

Q Can you please explain to us where it's located?

A "Departure witnessed by," I'm the first one.

Q And do you see the defendant's signature on that document?

A Yes. If you look above my signature that I just pointed out, you see my signature again as the officer witnessing the finger -- the -- "signature and fingerprint of," there's no fingerprint because he refused to put his fingerprint down, but then above that is his signature.

Q Did you see the defendant sign this in Detroit?

A Yes.

Q Turning your attention to the next page, what is this document?

A This is the Warning to Alien Ordered Removed Or Deported, Form I-294.

Q What is the purpose of this document?

A This document is the bar that's issued to him when he departs the United States.

Q And this is for the defendant?

A Yes, for the defendant.

Q Can you explain what the bar was for the defendant?

THE COURT: Can you hold on for a second. Can we go to the sidebar for a second?

(Sidebar.)

(Continued on next page.)

(Sidebar conference held on the record out of the hearing of the jury.)

THE COURT: I'm assuming that this document reflecting the defendant's criminal history is redacted.

MR. ALGOR: There's nothing on this document.

THE COURT: Not on this page.

MR. ALGOR: There's nothing in the removal packet.

MS. ROSTAL: There was, but that was taken out.

MR. ALGOR: Those were the pages that were taken out. There was an I-213 that included his criminal history and the basis, and that document is completely removed from the removal packet.

MR. CAMPOS: Do you want to show what has been put into evidence?

THE COURT: That's fine. I just wanted to make sure that was the case. The other reason I was concerned that the last question could prompt the witness to get into --

MR. ALGOR: It won't, Your Honor. It's only to say that he's barred for ten years and I'm done. I'm not sure, he may have already said that.

MR. CAMPOS: He didn't say that.

THE COURT: I just wanted to -- for the abundance of caution.

MR. ALGOR: Yes, Your Honor, I've told them many times.

THE COURT: Understood.

MR. ALGOR: Thank you, Judge.

(Sidebar concludes.)

(Continued on next page.)

THE COURT: You may proceed.

BY MR. ALGOR:

Q Officer Camaj, if you can tell us, how many years is the defendant barred that's part of this document?

A For a period of ten years.

Q Thank you.

MR. ALGOR: Just a moment, Your Honor.

THE COURT: Yes.

MR. ALGOR: Nothing further, Your Honor.

THE COURT: Okay. Any cross-examination?

MS. ROSTAL: Yes, Your Honor.

CROSS-EXAMINATION

BY MS. ROSTAL:

Q Good afternoon, Officer Camaj.

A Good afternoon.

Q We met out in the hallway today, correct?

A Yes.

Q And we've never met before, right?

A No.

Q So you know I'm Mr. Mbacke's lawyer and I'm going to ask you some questions?

A Yes.

Q You've met with the Government?

A Yes.

Q Prior to today?

A Yes.
Q How many times?
A Twice and then yesterday is the third time.
Q And talked over the phone before that?
A Yes.
Q How many times do you think you've talked over the phone?
A A few.
Q Did you ever tell anyone that Mr. Mbacke escaped when he had to have handcuffs taken off during security through TSA?
A No.
Q Did any -- did you ever hear that in connection with this case?
A No.
Q So you were -- you said you've been an immigration officer for now quite some time, right?
A Yes.
Q And have done dozens of deportations?
A Yes.
Q And you said only one person has ever been in cuffs?
A I only recall one that I dealt with.
Q And that's because you make a judgment call as a law enforcement officer that this person is going to be respectful and I don't have to worry about him?
A For them that I put the handcuffs on?
I wasn't sure what the question was, so I asked for

the individual that I had put the handcuffs on?
Q No, the other way around. For the people that you didn't put the handcuffs on.
A Okay. So what was the question, please?
Q You made a judgment call, in your law enforcement experience, that this was someone who could be trusted without cuffs; is that fair to say?
A Yes.
Q And that person you felt differently about, the one that you put in cuffs?
A That person conducted himself in a combative manner.
Q So have you heard of other officers putting people in cuffs to put them on airplanes for deportations?
A I can't recall. I mean -- I feel like -- you want me to speculate? I don't know.
Q Well, no. I'm asking what you are familiar with as an ICE officer. You know what other officers do just by hearing about their experiences, right?
A Possibly.
Q You talk to the other officers about the job?
A Yes.
Q And you go to trainings?
A Yes.
Q And you talk about what it's like to be down there, boots on the ground, putting people on airplanes?

A Yes.
Q And you talk about how to make that work in a way that's safe?
A Yes.
Q And you talk about how to make that work in a way that reaches the goal of getting them out of the country; that is the goal, correct?
A Yes.
Q And you found that being -- letting people not be in cuffs is a way of encouraging them to be cooperative?
A Possibly.
Q What other reasons are there?
A Well, not putting them in cuffs depends on their behavior. So if they're combative in nature and it calls for handcuffs, then handcuffs go on. If not, if they're compliant, then it's not necessary.
Q All the people that you've deported, the dozens of people, have all of them been in custody?
A Some have been -- for the most part, yes.
Q Would you say -- let's say you've done 20 deportations, give or take, were ten of them in custody?
A Yes.
Q Ten or more?
A Yes.
Q So five or ten were not in custody?

A It -- numbers-wise, I don't know. The -- what makes me say -- there are situations where I verify departures, and so, for example, as an officer on the non-detain docket, an individual comes to the office on their report date, we prepare a travel plan and they leave the United States accordingly. So, for example, those individuals, we meet with them at the airport according to a general agreement that we make at the office, and then the removal continues on that way.
Q You meet with them at the airport to escort them --
A To verify their departure from the United States.
Q And verifying their departure from the United States means escorting them to the plane?
A Yes.
Q And watching them get off?
A Watching --
Q I mean watching them get on.
A On the plane and leaving the United States, yes.
Q And that's when you fill out those documents with the fingerprint and the signature showing that they have been, in fact, removed?
A If they're leaving the United States on a foreign flight, yes.
Q All right. And in those situations, where you are on the -- what did you call it, the verified departure docket --

A The non-detained docket.
Q So non-detained, meaning people who have orders of deportation against them from a judge, correct?
A Yes.
Q But they're not in custody officially, correct?
A No. They're reporting on an order of supervision.
Q And if you are deporting them, you escort them to the plane and make sure they get on, right?
A Typically, we meet with them at the ticket counter, we complete the check-in process, and continue on to the gate and proceed forward.
Q Proceed forward meaning you watch them get on the flight?
A Yes.
Q And if during that time that those people who are not in custody, would you agree those people aren't in custody, the ones who are on your alternative detention docket?
A During the time that we're at the airport and we're verifying their departure, they are in our custody because if they become combative and decide that they do not want to leave, and pretty much resist, then they'll be arrested and placed in detention.
Q They will be arrested by you?
A Yes.
Q Using your authority as --
A Deportation officers.

Q And deportation officers who have authority to arrest someone at the airport because they're combative?
A Because they are violating the judge's order of the deportation and the agreement on the date that they chose to leave and the itinerary that they provided potentially for a verification of departure.
Q So the people who aren't combative and there's only been one, right? In your experience, you've had one person who was -- who presented that kind of a problem?
A A person that was combative --
Q That you put in handcuffs to get on a plane.
A Yes. Yes.
Q Now, if you have people who are not in custody on the alternative detention docket, and you put them on a plane, are they in your custody when they get on the -- just before they are getting on the plane? What's your view of that?
A They are in our custody. We are responsible for seeing them leave the United States.
Q And the fact that they are in the alternative docket, meaning they are on supervision --
A Alternative.
Q -- release status. Am I saying that wrong?
A Alternative to detention.
Q Alternative to detention.
A It's a program that's used in place of having you sit in

jail. So if you're complying and you are doing everything and you meet the requirements, you can potentially be released on an order of supervision on the alternative to detention program, but there are requirements. You are still responsible for reporting and if you violate those requirements, you may be detained and placed in custody.

Q And those requirements are in writing?

A On the order of supervision.

Q And the order of supervision is something that you have to review with the alien or the deportee?

A When they are -- when they are issued an order of supervision to be released, yes.

Q So that they know what the boundaries are?

A Yes. And they sign for it.

Q Very good. They have to sign saying I understand, I can't leave the state or whatever the other conditions are?

A Yes.

Q So nothing like that was signed on the 27th of March telling Mr. Mbacke what the conditions are of his -- were of his custody with you and the other officers --

A No.

Q -- is that fair to say?

A Not on the 27th, no.

Q So the people who you have escorted to an airplane who are not being held by ICE, do you consider those people in

your custody in the airport?
A Yes.
Q Now, if one of them turned around and walked away from you, would that be escape, in your mind?
A I would not allow them to walk away from me if their intention is to run from the deportation.
Q Understood.
Would it be escape from your custody, in your mind, that's my question.
A Yes.
Q Even though they're on release status?
A They're on an order of supervision. They are possibly on the alternative to detention program.
Q Understood. They're not incarcerated?
A No.
Q And they're not under an order of detention by any immigration officials?
A I don't understand order of detention.
Q Well, let me withdraw that.
So when you first met Mr. Mbacke at the airport, that was the first time you had ever engaged with him, correct?
A I met him at the airport, yes, for his removal.
Q When he was first dropped off?
A Yes.

Q And from the get-go, he was upset about not getting notice that he was being deported, right?
A He was upset about not having clothing with him. He was upset about going back to Senegal and not having anyone there.
Q And had he received notice prior to the 27th of March that he was going back to Senegal, as far as you know?
A I was the escorting officer, so as far as that goes, I don't know. I know that this was the day he's leaving, this is the day you're meeting, you're taking him, you are completing this mission.
Q Right.
So he had -- did he have any money with him?
A No.
Q And was there money that he had with him when they checked him out of the immigration jail?
A I don't know that he had any money. He showed me one of these cards -- a debit card that they get when they check out of jail, and we were in JFK when I went with him and he used the card at the ATM at JFK and it said zero balance, insufficient funds, and he checked it twice just to make sure he was doing everything right on the screen, and so that was his verification right there that there was no funds on that card.
Q So he was going to Senegal without a dime?
A There was no money on him.

Q And he was asking from the get-go to call his wife, correct?
A Yes.
Q And he was asking that, you know, we live close by here, can you just take me to say good-bye? He did tell you how close he lived to the airport, correct?
A I don't know how close he lives to the airport.
Q But he asked to be taken to say good-bye to his family?
A I don't remember him specifically asking to say good-bye to his family. I remember him complaining that he did not have clothing, that when he goes to Senegal, he doesn't know anybody there.
Q Okay. Wasn't he asking to use the phone?
A Yes.
Q To call his wife?
A Yes.
Q And that was from the minute he got out of the car to meet you guys, right?
A Sounds about right, yes.
Q And you told him that don't worry about it, we'll take care of it, you can make the call later, don't worry, it will be fine?
A No. I explained to him that he will be allowed to use the phone once, and that will be at the final moments before boarding where he was assured that he will be allowed to call

his wife and we will give her the information as to exactly when he arrives in Senegal, and so that she could then -- if she so chose to, make arrangements, however she chooses, that has nothing to do with us, on someone meeting him in Senegal. But we don't -- I don't allow that phone call until right before because what if we make a phone call from the get-go and then, for example, we get to JFK and there's a three-hour delay. So, for the officer's safety purposes, for security reasons, when we're done and we're finished and we're ready to get on the plane and leave, all right, we know this is good, you're going, here's the phone, we'll pass on the information, say your byes, and we continue on.

Q So you didn't let him make a phone call to his wife for security reasons?

A Right.

Q And talking to --

A For safety purposes.

Q For safety purposes of making a phone call to his wife, in your view, would have been unacceptable?

A It's not that it's unacceptable. It's not necessary at the time.

Q Now, when he said that there was a cousin or something there, that did not strike you as, perhaps, more problematic or dangerous than calling his wife?

A One of them has nothing to do with the other one, in my

mind. Calling your wife to share that information with her is best right before you leave because it's most accurate; here you go, this is when he arrives, this is the date, this is the time. Whereas, seeing your cousin at the airport when he was extremely concerned about being stranded alone in Senegal, in my opinion, that, for him, was a positive note because now he doesn't feel alone when he reaches Senegal. And he appeared happy, he was happy to see his cousin, everything seemed to be fine.

Q So you gave him permission to go to the other gate, to gate 20, to see the cousin?

A We didn't give him permission to go to any other gate. We gave him permission to go to the seat where his cousin was sitting.

Q Which was how far?

A Approximately eight to ten rows away from us.

Q So approximately eight to ten seats away from you?

A Rows. One row of seats, another row of seats, another and so on.

Q So let's say you are sitting where you are now --

A Yes.

Q -- and pretend this is gate 22, where -- when Mr. Mbacke went over to visit the cousin, where was he? How far away from you, if you just use the physical courtroom here? Where I am? Where? Where the jury is?

A He was probably, like, from here to towards the back of the courtroom.

Q You said we gave him permission to go as far as back of the courtroom to see the cousin. What exactly did you say when you gave him that permission?

A He shared with me that Lassiter gave him permission and I didn't -- did not interfere with that. I expressed to him, okay, great, you have somebody that you know when you get back to Senegal, you won't be alone.

Q So you're saying today to the jury that Lassiter gave Mbacke permission to go see the cousin?

A That's my understanding.

Q Well, it's not your understanding because you were there, you heard it. Who --

A No, because when he got up, I didn't hear him say it, that's why I stopped him (indicating).

Q Okay. So you're saying when he stood up in the gate area, you put your hand out in front of you --

A "Hey, hey, where're you going?"

Q Talk to the hand?

A No, no, not talk to the hand, just hey, hey, where're you going.

Q And how far away from you was he when you said where are you going?

A No more than five feet.

Q And you did that because, when he stood up, that was out of bounds for you?
A It was just something abrupt.
Q You needed -- he needed permission to stand up when he was four or five feet from you; is that -- was that your view?
A No. It's -- you need permission from us to walk away from us.
Q So when he did that and you put out your hand, he said Lassiter gave me permission to go over and see my cousin?
A He pointed out to Lassiter and he expressed to me that Lassiter gave him permission to go see his cousin.
Q So you are telling the jury today you did not give him permission to go see the cousin in the first instance?
A I conceded with that permission.
Q I'm sorry?
A I didn't interfere with the permission.
Q Okay. You didn't give him permission, but you didn't interfere with the permission --
A No, no. I allowed it.
Q Okay. But Lassiter gave him permission in the first instance, as far as you could tell?
A As far as my understanding of the scenario, yes.
Sorry.
Q Okay. So you -- this isn't the first time you have talked about this case, obviously. Let me be more specific.

You've written a report about this case, about your observations from the 27th, what happened, correct?
A Right.
Q And you were writing this report on the 29th of March, two days later, right?
A No, that's wrong.
Q When were you writing the report?
A If it happened on the 27th, we did it the very next morning at the office.
Q The 28th?
A Yes.
MS. ROSTAL: May I approach, Your Honor?
THE COURT: Yes, you may.
MS. ROSTAL: Let me show you what's been marked Government's Exhibit 3500-JC-1 (handing).
THE COURT: Officer, unless you are directed otherwise, just read the document to yourself, okay?
THE WITNESS: I need glasses.
THE COURT: Okay. Do you have them with you?
THE WITNESS: Yes.
THE COURT: Okay. You can -- are they outside or with your --
THE WITNESS: They are outside on the bench.
THE COURT: I'm happy to have one of the lawyers go outside and get you your glasses.

(Short pause.)

MR. CAMPOS: (Handing.)

THE WITNESS: Thank you.

Sorry.

Q While you are looking at that, let me just ask you, Officer, does that refresh your memory that the report was dated March 29th?

A Yes. This says March 29, 2018.

Q So two days after the incident, right?

A Right. But the only thing that's a little puzzling to me is --

THE COURT: Hold on, Officer, make sure you are not going to read something into --

THE WITNESS: No, no, no, nothing. Nothing. I was just referring to the date.

A This happened on the 27th. The next morning we flew back to the office, we prepared these memos that day.

Q The 28th?

A Yes. So the only thing that I can think of why this says the 29th is that they were printed on the 29th and the system prints the date that they were printed on.

Q I see.

All right. Well, you did just testify that Lassiter gave Mr. Mbacke permission in the first instance to go see the cousin, right?

A That's my understanding.
Q And the very next day, when you wrote your report, you did not mention that, correct?
A I don't know. I can read the report.
Q Go ahead.
(Short pause.)
A So what was your question? I'm sorry.
Q In your report, did you state that Lassiter gave Mr. Mbacke permission to speak to the cousin?
A No.
Q Now, you had custody, then, of the -- I guess it's called, what, the removal envelope?
MS. ROSTAL: Mr. Manson, do you mind if we turn the ELMO on?
Q Is it the removal envelope?
A The removal packet, yes.
Q By the way, is it removal or deportation?
A That's a removal packet.
Q Right, but was Mr. Mbacke being subjected to removal or deportation? What is it called?
A Removal from the United States; he was being deported.
Q But was he being excluded? Is that a different word?
A That 205 answers that question. If I can see the 205 again I can answer it for you.
Q It's all right. It's all right.

Let's get back to, I guess, the removal packet, all right, Government's Exhibit 6.

You -- he was asking to see that; was he not, to see the paperwork that you had?

A (No verbal response.)

Q Mr. Mbacke was asking you to see the paperwork that you had that permitted him to be taken into custody to be -- or taken to the airport to be deported?

A I don't recall him asking --

Q He never asked to see his travel document?

A I don't recall. I don't recall -- to see his document or the --

Q To see his travel document?

A Possibly at one point he saw the document at the counter and he asked what that was and he was informed that that was his travel document.

Q Now, ICE had been trying to get his travel document from the Senegalese consulate since, like, 2015, correct?

A I don't know that. I'm not the docket officer that was handling the case. I'm the escorting officer that met him at the airport to remove him foreign.

Q But he was asking you to see that travel document because this had been the holy grail that had been hard to get, and he wanted to see how suddenly this document appeared, correct?

A In that moment?

Q Yes.
A I don't know how long it took for the agency to get the document -- the travel document.
Q Did you show Mr. Mbacke the travel document the day that you were with him on the 27th?
A He saw the travel document at the ticket counter when I was completing the -- the check-in process.
Q Did you hand it to him so he could look at it?
A I would never hand him a travel document, or anyone else, out of fear that they would rip it up.
Q Okay.
So did you ever joke with Mr. Mbacke about taking money from people?
A Never.
Q Never what, taking money from people? In what context?
A You just asked me if I ever joked with him about taking money from people. Never.
Q Taking money from people for what?
A You asked me if I joked about taking money from people. Never.
Q What do you think I mean?
A That I joked with Mr. Mbacke.
Q Well, did you joke with him at all?
A No.
Q You didn't, like, laugh with him or try to --

MR. ALGOR: Objection, Your Honor. This has been asked and answered five times.

THE COURT: Overruled.

Q Did you joke with him at all?

A The only time I expressed joy to him was when he pointed out that he had his family -- his relative in the boarding area, and I was, like, okay, great then. See, now you have somebody that you are going to be with in Senegal and you won't be alone. I recall that.

And then even that, it's not joking, it's just a pleasant mannerism.

Q And so your testimony is you never joked with him about taking money from deportees --

A Never.

Q -- in connection with avoiding their deportation?

A Never.

Q Taking money from Mexicans, you never said that?

A No.

Q Did you check his bag?

A What bag?

Q Did Mr. Mbacke have a bag when he was -- when you were checking in --

A No, he didn't have a bag.

Q He didn't have any property with him?

A He had -- I can't recall at this point. It's possible

that he had a plastic bag that he brought with him from -- I don't know. I can't remember.

Q But you didn't have anything in the -- the document envelope or in your -- well, who was in charge of the tickets?

A For -- at what --

Q Who was in charge of the boarding passes and the tickets? Who was holding onto those?

A At one point, I was. At another point, Lassiter was. When he wasn't so happy with me, because I wouldn't let him use the phone, he -- he took more of a liking towards Lassiter. Okay, no problem.

Q Okay.

What is your -- you said that the policy manual about handcuffing is that there's a handcuffing policy, correct?

A There is a handcuffing policy, yes.

Q But one that -- that you don't follow, right?

A I don't understand.

Q Well, if you've only handcuffed one person out of the dozens of deportations, you don't follow that policy.

A That's not true. You follow the policy, and based on the policy, you act on what the policy requires.

Q So let's talk for a moment about what happened after Mr. Mbacke left the airport. You said that you all went around canvassing, trying to find him, right?

A Yes.
Q And I think you said you got on your phone to call your supervisor?
A Liggins first, and then the supervisor.
Q And Liggins is who?
A Liggins is one of the deportation officers back in Detroit.
Q So the first call you made from JFK after someone in your custody escaped was to your -- another deportation officer in Detroit?
A At that moment, it wasn't deemed that he had escaped. It was possible that he could be in a bathroom, he could be --
Q What time did you call Liggins?
A I do not recall.
Q Well, you have 3500-JC-1 in front of you, correct, that document?
A 3500-JC-1.
Q I think there's only one, right?
A Okay. Yes.
Q If you want to take a look at the -- use your glasses, take a look at the second page, first full paragraph.
(Short pause.)
A What am I looking at? I'm sorry.
Q Well, I want to know if this refreshes your recollection about when you first called someone on the 27th after you

realized Mr. Mbacke wasn't there.
A Which part in particular?
Q What was the first phone call you made reporting Mr. Mbacke's absence?
A The first time that I called anyone to report that he escaped our custody was Supervisor Ron Whalen.
Q So not Liggins?
A No.
Q So did you just misremember Liggins?
A No, no, no. I called Liggins before Ron Whalen, but at the time, it wasn't deemed that he had escaped. I was hoping that maybe Liggins knew somebody that he could have been talking to on the phone that he was talking to and somebody who shared information with us that would help us figure out what's going on with him. So there was hope that possibly this guy is in a bathroom and he's going to walk out any second, or walked into a store or something.
Q So what time was that phone call made?
A I can't recall.
Q How long before the phone call to Whalen?
A Not too much -- like, after we started looking for him, but before I called Whalen, during that period of time.
Q Well, you called Whalen at 9:19 p.m., correct?
A 9:19 p.m., yes.
Q And you don't state anywhere in your report from, I

guess, the -- you said the 28th of March that you called Liggins, correct?
A As we were looking, I kept calling Deportation Officer Brennan Liggins.
THE WITNESS: Sorry.
THE COURT: Go ahead.
MS. ROSTAL: Okay.
Q And what if Whalen -- do you agree that Whalen was 9:19?
A It has DPO Whalen, 9:19 p.m., yes.
Q So what time do you think you called Liggins?
A I don't remember.
Q So the first call you made where you felt like this guy has escaped was 9:19 p.m.; is that fair to say?
A No. The first call where -- when he escaped our custody, where, okay, we're not finding him, he's gone, 9:19 p.m. to Supervisor Whalen.
Q So you first made the determination that he was absolutely an escape, in your mind, at 9:19 p.m.; would you agree with that?
A Yes.
Q Before that, there was hope he was just --
A Somewhere in the --
Q -- doing something else?
A Yes.
Q And then it's also true -- well, and the 9:19 phone call

was to Detroit, right?
A 9:19 p.m., yes.
Q So the first phone call that was made to the local authorities, Port Authority and JFK, was at 9:29 p.m.?
A When I was on the phone with Supervisor Whalen and he told me to call Port Authority, I turned over to the ticket counter and asked them if they could please put me in contact with the Port Authority because there was an emergency, and they did, and they handed the phone over to me and I spoke to Port Authority.
Q So when you talked about 9:29 p.m., from your phone calls, what were you referring to?
A Where do you see 9:29 p.m.?
Q Second page, second full paragraph.
MR. ALGOR: Your Honor, objection.
THE COURT: Can I see the parties at the sidebar, please?
(Sidebar.)
(Continued on next page.)

(Sidebar conference held on the record out of the hearing of the jury.)

THE COURT: Ms. Rostal, I'm happy to, and I have been giving you quite a long leash of the various many topics you explored with this witness. Some of them you have gone over many times and I'm not actually sure what the purpose of this questioning is, that's well before I get to the point that while your other questions established that there was some inconsistency between what he testified to and the written document, which would allow hearsay to come in, it's not clear to me that there's been any inconsistency established, and now you are just asking him what he's referring to in his written report.

MS. ROSTAL: Understood.

THE COURT: So I have been very patient to not let this go on forever, but my patience is running low because it's not clear to me that at this point we are making any forward progress, so move away from the document if you're just going to ask him general questions about the report because there's no inconsistency and move on because --

MS. ROSTAL: Life's short.

THE COURT: Yes.

MS. ROSTAL: Understood.

(Sidebar concludes.)

(Continued on next page.)

BY MS. ROSTAL:
Q Officer Camaj, do you recall as we sit here today, what time you called Port Authority?
A I do not have an exact time for you as to what time I called Port Authority. I have an exact time as to when I called the supervisor because I was able to look at my phone and document that it was 9:19 p.m. when I called Officer Whalen. As far as the 9:29 that you were referring to, that was after Port Authority was there and I was talking to Port Authority and it occurred to me to think, what time is it, and I looked and I saw it was 9:29. So --
Q Understood. So at 9:29, that's when the local law enforcement came to get involved in the incident?
A No. That's -- here.
(Short pause.)
Local law enforcement authority --
THE COURT: Remember, you are not to read from the document unless you need it to refresh your recollection and then you can answer the question if you are able to after you read the document to yourself.
THE WITNESS: Okay.
A So law enforcement was there before 9:29, because people -- law enforcement was gathering to look for the individual and they were asking questions, trying to figure out more about who he is, what's going on, et cetera, et cetera. So,

in the midst of looking for him, it occurred to me to realize, in that moment, I don't know what time it is and when I looked at it, it was 9:29.

Q Okay. So just one last area I want to ask you about. Who filed the G391 with Delta Airlines to get permission to take a deportee on the airplane?

A I don't know.

Q Did you -- you didn't have anything to do with that then?

A No.

Q Who was in charge among the three of you? Was there any one of you who was considered in charge?

A Not really.

Q And --

A All three of us there were there collectively doing the same job.

Q And did anyone discuss talking -- making sure that the airline got notified that there was a detainee who was going on a flight?

A If you look in the travel packet, you have the clearances, so all of that stuff is done ahead of time by the travel department.

Q So you guys don't get involved --

A We don't get involved with that at all.

(Continued on the following page.)

CROSS-EXAMINATION (Continued)

BY MS. ROSTAL:

Q So you guys don't get --

A We don't get involved with that at all.

Q Do you ever talk to the personnel at the gate or to the pilot to let them know what you're doing?

A Yes.

Getting back to earlier when we said we go up to the counter to make sure the seating arrangements are right, we tell them right off the bat this is who we are and this is what we're doing.

Q And I understand the pilots have a right to refuse to let people on the plane; is that correct?

A That is my understanding, yes.

Q And does that ever happen?

A Possibly.

Q Does anyone ever -- I mean do you ever fudge it and not tell the pilot or not tell the airline?

A No, I've seen it where people have fought in the gate area and the pilot got up and said, No, you're scaring my passengers, so you're not leaving on this plane. Okay.

MS. ROSTAL: All right. I don't have any other questions. Thank you.

THE WITNESS: Sure.

THE COURT: Any redirect?

MR. ALGOR: No, Your Honor.

THE COURT: Officer, you may step down. Thank you.

(Whereupon, the witness was excused.)

THE COURT: Is the government prepared for the next witness?

MR. ALGOR: Yes, Your Honor. The government calls Deportation Officer Ahmed Lassiter.

(Witness takes the witness stand.)

THE COURTROOM DEPUTY: Please state your name.

THE WITNESS: Ahmed Lassiter. L-A-S-S-I-T-E-R.

THE COURTROOM DEPUTY: Can you please raise your right hand.

(Continued on next page.)

**AHMED LASSITER**, called as a witness, having been first duly sworn/affirmed, was examined and testified as follows:

THE WITNESS: I do.

THE COURTROOM DEPUTY: Have a seat and speak into the microphone.

DIRECT EXAMINATION

BY MR. ALGOR:

Q Good afternoon.
A Good afternoon, sir.
Q Who do you work fork?
A Department of Homeland Security, ICE.
Q And what does "ICE" stand for?
A Immigration and Custom Enforcement.
Q How long have you worked for ICE?
A Almost three years, a little over, about two an half years.
Q What is your title?
A Deportation officer.
Q Have you held that title the entire time you worked for ICE?
A Yes.
Q Where do you physically work?
A I work in Detroit, Michigan.
Q Have you always worked out of Detroit?
A Yes, sir.

Q What type of responsibilities do have as you deportation officer?
A I work in ATD section, which is alternative to detention. And what we do there -- what I do there is I interview families or people that come into the office and try to set up travel for removal.
Q How long have you been a member of the alternative to detention team?
A Since I came over. So I would say roughly about two years.
Q As part of your responsibilities, have you ever removed someone from the United States pursuant to an order of removal from an immigration judge?
A Yes, sir.
Q How many times have you removed someone?
A I would say six or seven times.
Q When was the last time you removed an individual from the United States pursuant to an immigration judge's order?
A It would have would've been in February. I went to Djibouti.
Q When escorting someone being removed from the United States, how many times -- and during those six or seven times that you removed someone, how many times were those individuals handcuffed?
A In the airport, never -- I never handcuffed them, only

when they come to meet us at the airport.
Q And why is that?
A Why do I handcuff them?
Q Yes.
A Because I want them to feel as human as possible. I don't want to cause a scene at the airport.
Sometimes if a captain sees that and the people, it might a cause tension or sometimes the pilot may not feel comfortable with the person in restraints flying.
Q Officer Lassiter, I want to turn your attention to March 27th of this year.
Were you working that day?
A Yes, sir.
Q What were you assigned to do that do day?
A Do an escort removal.
Q How did you get assigned to that task?
A We have travel order, and I volunteered.
Q When did you learn the identity of the individual that you would be removing on March 27th?
A Like 24 hours later, around about.
Q And once you learned that identity, did you know the individual that you would be removing?
A Yes, I did.
Q How did you know that individual?
A In the detaining section, he was one of the people that

would regularly report to me at that office.
Q I now want to turn your attention to approximately 10 a.m. on March 27th of this year.
Where were you?
A Arriving at the airport to meet my fellow officers and the subject.
Q What airport was that?
A Detroit Metro Airport.
Q After you arrived at Detroit Metro Airport, what did you do next?
A I received custody of the individual. And we proceeded to go to the ticket counter to get our ticket for departure.
Q Would you recognize that individual that you were removing on March 27th?
A Yes, sir.
Q If you saw him?
A Yes, sir.
Q Did you see him today in the courtroom?
A Yes, sir.
Q Could you please point to him and indicate an article of clothing?
A Wearing a white dress shirt.
MR. ALGOR: Your Honor, for the record indicating the defendant.
THE COURT: The Court notes that the witness has

identified Mr. Mbacke.
BY MR. ALGOR:
Q Officer Lassiter, was the defendant in handcuffs when he arrived at the airport?
A Yes, sir, I believe so.
Q Now, you said that you -- once you received the defendant, you went up to the ticket counter; is that right?
A Yes, sir. Well, we received him outside, and then we all proceeded to the ticket counter.
Q Okay. And once you received him, did he have handcuffs at that point?
A When he came to our custody -- when they get out of the van or the truck, they removed the handcuffs and then we take him. So we didn't take him into the airport with any restraints.
Q After you checked in, where did you go?
A We proceeded to go to the TSA.
Q And once through TSA, where did you go after that?
A We proceeded to go to our gate.
Q Approximately what time did you depart Detroit?
A I'm not a hundred percent sure. I would say probably after 2 or around 2 we were departing.
Q What was the destination of your flight from Detroit?
A New York and JFK Airport.
Q While on the plane from Detroit to JFK, where did you

sit?
A I sat at the very back of the plane. Next to the subject.
Q And were you in an aisle seat or a window seat?
A I was in the aisle seat, and the subject was next to me in the window seat.
Q And were there additional officers with you on the flight?
A Yes. There was an officer that was across the aisle from me. I believe that was Officer Hall. And then there was an officer in front of him, I believe that was Officer Camaj.
Q Do you recall approximately what time you landed at JFK Airport?
A I'm not a hundred percent sure. I would say around 5 p.m., maybe a little later.
Q What terminal did you arrive at at JFK?
A I believe it was Terminal 4. I'm not a hundred percent.
Q Once you arrived at Terminal 4, what did you do next?
A We proceeded to go to our gate, B22, try to locate to make sure we knew exactly where it was at.
Q And what gate did you say?
A I believe it was B22.
Q While you walked to Gate B22, where was the defendant?
A He was next to me. It was right at that time that we were bringing him, I was with him.

Q Once you arrived at Gate B22, what happened next?
A We located our gate, and I believe the officers that were also there with me said they were hungry and wanted to get some food.
Q And did you go and get food at that time?
A Yeah, we all proceeded to go get food.
Q And where did you go?
A Buffalo Wild Wings.
Q While at Buffalo Wild Wings, did you eat?
A No, I didn't eat.
Q Did the defendant eat?
A No, he did not.
Q What were you doing while you were seating there at Buffalo Wild Wings?
A I proceeded to Buffalo Wild Wings, I was talking to the subject, my coworkers, looking at my phone, just passing the time.
Q Did there come a point where the defendant asked to leave the restaurant?
A Yeah, I believe he said that his legs, he wanted to stretch his legs, and he didn't want to eat, but he would have some coffee.
Q Did you allow him to do that?
A Yeah, I told him we would -- we would go and get some coffee. They made reference to a Dunkin' Donuts that was near

so I said I'll take you over there and we'll get some of coffee.

Q So you took him to Dunkin' Donuts; is that right?

A Yes, sir.

Q Did you buy anything at the Dunkin' Donuts?

A Not for myself, but I did buy the subject coffee.

Q Once you were done buying the defendant a coffee, where did you go after that?

A I believe we proceeded back to our gate and met the other officers that were there.

Oh, no, I'm sorry, I take that back. We went back to the restaurant. I'm sorry.

Q And once you arrived at the restaurant, what happened after that?

A After we arrived back to the Buffalo Wild Wings, we kind of stood. There was a basketball game on television. We kind of watched it a little bit while the other two were eating.

Q And you eventually left Buffalo Wild Wings?

A Yes, that's correct. We went back and then proceeded to our gate.

Q Once you were at the departure gate, what did you do?

A We sat down at the departure gate.

Q Can you explain to the jury where yourself, the officers and the defendant sat?

A Yeah. So the way it's set up, there's like a set of rows

that are facing each other. So I sat in one seat, and the defendant -- the subject sat immediately to my left. There would have been an open space next to him, and then my other partner, I believe that was Officer Hall, sat in that space next to that.

So there was an empty space between the subject and Hall, and Officer Camaj sat across from me.

Q While in the waiting area, what, if anything, was the defendant doing?

A While in the waiting area, we just sitting around talking. And I know that he wanted to use the phone. So we let him use the phone while in the waiting area.

Q Whose phone did the defendant use?

A I let him use my phone.

Q Why?

A Because he wanted to make a phone call and we told him previously we'll make sure that he's able to get the phone call to call. He was nervous about not having clothes or money. We said we can call and get all that stuff straight before his departure.

Q Do you recall how long the defendant was on your phone?

A He made several phone calls. I would say the duration would have been anywhere 30 to 40 minutes, but I don't know exactly how long.

Q Did you hear anything the defendant said on the phone?

A I couldn't make it out. Most of the conversation, to the best of my knowledge, was in another language.
Q While the defendant was on your phone, what were you doing?
A I had another phone. I might have been looking at that, talking to my coworkers sitting next to him.
Q Did the defendant get up at any point while in the gate area?
A Yeah. After he made the phone calls, I believe that he had to use the restroom, and I told him I would take him to a restroom.
Q And you took him to the restroom at that point?
A Yes, sir.
Q While you were at the restroom with the defendant, where did you stand?
A I stood at the enter and exit point of the restroom. There's one way in and one way out, and I stayed at the exit portion of that.
Q I want to turn your attention to approximately 8:15 p.m. on March 27th.
Where were you located at that time in JFK Airport?
A I believe I would have been -- again, I'm not exactly sure on the time that everything was going to, but most likely at the gate.
Q Do you recall a moment when the defendant asked

permission to leave the gate area?
A Yeah. When we got back from the restaurant, I believe that he seen a cousin or a relative that he said that he knew from when he first arrived to New York, and he wanted to know if he could go sit with them.
Q And did you allow him to go sit with his cousin?
A Yeah, he was given permission to go and sit with him.
Q Approximately how far was the defendant sitting with his cousin from where you and the other officers were sitting?
A I would say it was maybe like eight to ten rows, so about maybe 30 feet, no more than that.
Q Once the defendant was with his cousin, what did you do?
A I continued to sit in the section that I was at. We could -- you could see him from where I was sitting at, he was right next to a pillar, so I sat there.
Q What happened next?
A You know, of course, time is passing by. At some point I received a page over the front -- over the loud speaker to go to the ticket counter.
Q And could you see the defendant while you were at the ticket counter?
A I didn't look in his direction while I was at the ticket counter, I kind of assumed that my other partners were in that area, so I went to talk to the people at the ticket counter.
Q What happened next?

A After I went to the ticket counter, I proceeded back to my seat.
Q And were any of the officers in that area at that point?
A Yeah, Officer Camaj was there, and I believe Officer Hall was making his way back towards me.
Q At some point did the gate -- did a gate agent bring tickets to you?
A Yeah. Well, after I came back and sat at my seat, the ticket agent that I talked to came back to me again to let me know the changes that were made with the tickets.
Q And what happened next after you received those tickets?
A After we received those tickets, a short while later, Officer Hall and Officer Camaj went to go get coffee, I believe.
Q Did there come a point in time where you learned that the defendant was no longer in the gate area?
A Yes. When Officer Hall and Camaj went to go get coffee, they asked if I would watch their bag and then they wanted to go get coffee, and they came back less than a minute later and said that Mbacke was no longer there where he was at previously.
Q Once you learned that the defendant was no longer in the area, what did you do?
A Well, I kind of gave him the benefit of doubt, I thought maybe he would have went to the restroom, but I didn't know

exactly where he was. So we kind of looked in our immediate area to see where he was at. And I also asked some people that were sitting in that section if they had seen where that -- the group of people had went that was in that area.
Q And when you spoke to those people in the area where the defendant was speaking to his cousin, what did you learn?
A I was told that they believe that that person or that the people that were there had a change of flight, and so they changed terminals.
Q And what terminal did you learn they were -- that their change of flight was to?
A They didn't know, or they didn't tell me exactly for sure. But I went downstairs and I found out that that shuttle went to the Terminal 2, so I assumed they would have been at Terminal 2. I'm not really familiar with JFK how that works.
Q Did you go to Terminal 2 then?
A I did go to Terminal 2.
Q And what was the result of your search in Terminal 2?
A I did not see them. The people that -- the people that moved from Terminal 2, they said that they had not seen him. So I went and I talked to the person at -- one of the agents that was there at the Port Authority.
Q You spoke to Port Authority at Terminal 2?
A Yes.
Q What did you do after you didn't find the defendant at

Terminal 2?
A We located, or I kind of linked back up with my fellow officers at the top and we got there just kind of gave our reports of -- all the information that we had. And also while I was looking for the defendant, you know, I called the numbers that he called on my phone hoping to get some information, hopefully from somebody that he recently called.
Q When you made those phone calls to the numbers that the defendant had called using your phone, did you speak with anyone?
A I did. I spoke with, I believe I was able to make contact with two people.
Q And who were those individuals?
A I believe one stated that he was a cousin or a friend, somewhere along those lines, and another one was his wife.
Q Did they tell you whether they had spoken to the defendant?
A Yeah, they said they didn't. The wife said that she didn't speak with him.
And I was just trying to get information about New York. I was asking if there was any friends or relatives that she was aware of that lived in New York.
Q Did you eventually return back to the B22 gate?
A Yes.
Q And what did you do upon returning to B22?

A After returning to B22, we talked to different agents that were there also assisting us. Then we proceeded to go to the video room or wherever they view video recordings.
Q Did you review surveillance video of the defendant?
A There was surveillance there, but I was, you know, thinking about what was going on. So I didn't really stop to really look at a lot of the surveillance tape. I seen one where they showed a cab. But I didn't review all of it. There were playing while I was in there, and I kind of glanced. We were trying to figure out the cab number that he may have gotten into it.
Q What happened after your review of the video in the surveillance room?
A We gave all the information I had on my phone, we went back up. I believe the New York ICE team was also there assisting us, and they said they were going to go out and try to see if they could locate some of the contacts in the area.
Q And once those -- that information was provided, where did you go next?
A After we did what we could do there, we proceeded to go back to our hotel.
MR. ALGOR: Could I have a moment, Your Honor?
THE COURT: Yes.
MR. ALGOR: Nothing further, Your Honor.
THE COURT: Okay, at this time we're going to take

our afternoon break, because I know everyone wants to stretch a little bit.

So why don't I see all of you -- Mr. Manson will take you to the jury room and will see you back in about 15 minutes.

All rise, please.

(Jury exits the courtroom.)

THE COURT: Okay, please be seated.

You may step down.

(Witness steps down.)

THE COURT: About how much cross-examination do you think you have?

MS. ROSTAL: Twenty minutes, maybe.

THE COURT: Okay.

Who's the next witness?

MR. ALGOR: It's Deportation Officer Thomas Koval.

THE COURT: Okay.

MR. ALGOR: He's the one that's the custodian of the gate files. So we'll be moving in a number of exhibits. And I understand that Ms. Rostal wants to move in exhibits.

Is that true?

MS. ROSTAL: Yes.

THE COURT: And how many witnesses does the government have after?

MR. ALGOR: One additional.

THE COURT: Okay. So let's see how far we get today, stopping at a little after 4:30.

The government anticipates resting sometime tomorrow?

MR. ALGOR: Yes, Your Honor.

THE COURT: All right, I'll see you in about 15 minutes. Thank you.

(Whereupon, a recess was taken at 3:25 p.m.)

(Whereupon, the witness resumes the stand.)

THE COURT: All rise.

(Jury enters the courtroom.)

THE COURT: Okay, please be seated.

MS. ROSTAL: May I proceed, Your Honor?

THE COURT: Yes.

CROSS-EXAMINATION

BY MS. ROSTAL:

Q Officer Lassiter, good afternoon.

A Good afternoon.

Q We just met today?

A Yes.

Q You know I represent Mr. Mbacke?

A Yes, ma'am.

Q And you spent some time with him that day on the 27th talking with him; is that right?

A Yes, ma'am.

Q You were very kind to him?
A Yes, ma'am.
Q That probably is something you try to do with people in that situation being deported?
A Yes, ma'am. I make them as comfortable as possible.
Q And you started by saying it was important to you that you give him some humanity?
A Yes, ma'am.
Q And when he first got out of the car after being booked out of the immigration detention facility to the airport, he saw you among the three officers when he first arrived there, right?
A Are you saying -- we were all there. But, yes, he did see me.
Q When he got out of the car, was he surprised to see you?
A Maybe. He could have been surprised. I don't know, I can't tell you what he was thinking.
Q You had been his supervising agent or -- officer, I guess, when he was on the alternative to detention program?
A Yes, ma'am, he did report to my office.
Q So you spent sometime getting to know him over that time.
A Yes, ma'am.
Q And I think that -- was he -- did you have any reason to think he was expecting to see you that day?
A No, ma'am.

Q And you -- and you got him a cup of coffee at Dunkin' Donuts?
A I was at JFK, but, yes, did I buy him some coffee.
Q I was just thinking of it because there was some -- there's some question about Buffalo Wild Wings.
You remember being at Buffalo Wild Wings?
A Yes.
Q At Buffalo Wild Wings, the other guys, Officer Hall and Officer Camaj, were eating, right?
A Yes, ma'am.
Q And they said something -- well, you asked Mr. Mbacke if he was hungry, would you like something, right?
A Yes, ma'am.
Q And the other guys, did they ask that?
A I don't recall. They may have. I don't remember.
Q And he said, Thank you for asking, and that he would just take some coffee or something, right?
A Again, I can't remember exactly what words were said, but something along those lines, yes.
Q Now, you were trying to keep him calm that day.
A Yeah, everyone I deal with, just relaxed and calm. I understand it can be a stressful experience.
Q He, from the get-go, really wanted to call his wife; is that fair to say?
A Yes, ma'am.

Q And you had met his wife previously when he was on supervision with you, right?
A Yes. The only -- she reported with him once before, and another time she reported when I tried to get the GPS unit from her.
Q And she lived fairly close to the airport?
A I'm not sure of the location that she lived.
Q But he kept saying, Why can't I go back and say goodbye and talk to my wife, right?
A I believe so.
Q Now, had you had the impression, in preparation for this deportation, that anybody had given Mr. Mbacke warning that he was going to be deported on the 27th?
A I don't know if somebody did that. I would assume that. Because normally how it works, we meet and their contact is made and they normally do that. So I assume that he was aware.
Q So the practice is to give people fair warning of deportation, correct?
A Well, in custody, they know that they're going to be deported when they're in that situation.
Q They know that they're ultimately going to get deported, but they don't know the day?
A Yeah, they may not know the exact date and time that far in advance, but they know in a reasonable amount of time. But

that's not something I do, so I don't know exactly when that information's provided to them.
Q In the deportations that you have done, have you been involved in notifying people about the day of their deportation so they can plan for it?
A I have never done that, no.
Q Is that somebody else's job in those situations?
A Yes, ma'am.
Q So in this particular situation, would that have been Officer Koval's job?
A If he was the assigned officer. I'm not a hundred percent sure who was assigned to him in that detained docket. But whoever was assigned to him. I know Officer Koval brought him to the airport, but I don't know who the actual case officer was.
Q So Officer Koval was the one who would have booked him out of the ICE detention facility, right?
A I'm not certain how -- that's a different section of the job and I'm not exactly sure the inner workings of that. I just knew where I was supposed to meet him.
Q I see.
I think you testified on direct that you spoke to Mr. Mbacke -- well, first of all, you let him use your phone for sometime, right?
A Yes, ma'am.

Q Now, he had asked at the beginning of your time with him that day, as far back as when you first saw him in Detroit, to the make those phone calls and was told no?
A At that time. We said that we're going to wait until we get to New York before you try making the phone calls.
Q You were just like two years on the job at this point?
A A little over two years. I'm not exactly sure. But, yeah.
Q And Officer Camaj then was the most experienced of the three of you?
A I believe so. I don't know exactly how long he was in, as opposed to Officer Koval.
Q And was Officer Camaj sort of in charge of this deportation?
A If you want to say someone was in charge, we all pretty much had the same kind of say. But he may have been the senior ranking officer. But there was nothing listed as, okay, this officer is in charge of you two.
Q Well, if he said no to Mr. Mbacke about making phone calls to his wife and family, would you have felt comfortable crossing him on that?
A He has a little more experience than me, and so if he felt uncomfortable, I don't like to go -- he maybe knows a better reason why, so I would probably abide by that.
Q So if it were up to you, you would have probably let him

make his phone calls at the beginning when you were still in Detroit?
A No, that's something I also do as well. I want to make sure that we get to where we're going.
Because prior to that, we don't even know if there was a gate change. So I don't want to have someone give information and then have to change it again. But once you're at the terminal, you know, okay, this is the depart time, this is your arrival time, now go ahead and make that call, so we're not making a whole lot of different phone calls.
Q Well, you had what -- from what time did you leave Detroit?
A I believe around 2.
Q So -- and that flight is only about an hour and half or so?
A I'm not a hundred percent sure, maybe, possible.
Q And then you had quite of bit of time in the airport starting from -- I'm sorry, remind me what time you arrived at JFK?
A I believe it would have been probably around 5p.m., maybe a little later.
Q So between 5 p.m. and 7:20 or 7:30 when he starred using your phone to make phone calls, he was told no that he couldn't up until that point?
A While he was in Detroit, we told him that when we get to

New York, he would be allowed to make phone calls.
Q Now, you said on direct that you spoke to his wife after Mr. Mbacke had left the airport, correct?
A Yes, ma'am.
Q And that was you calling her on your phone to just find out what, if you can get more information.
A Yeah.
When we determined that he was no longer there, I knew that he made phone calls, so I didn't know what was going on, exactly where he was at, what he might be thinking. And I don't know the relatives or the family or friends that -- the resources he may have had in New York. So I was calling to try to see, hey, do you know any family members or any members that he may have.
Q And when you said on direct that she told you she had talked to him, she was talking about the day before, on the 26th, correct?
A I'm not exactly sure.
Q Well, did you get the impression when you spoke to her at -- did you say -- did you say 9:38 p.m., around there?
A If it's written in the statement, I would look at that, but I don't know for certain. I can't remember.
Q But it was after you realized that he was gone?
A That I called his wife?
Q That you called the wife.

A Yeah.
Q And when you spoke to her, you did not have the impression that he had called her since you had been with him and he left the airport, correct?
A At that point I didn't know. That's why I was calling, it was kind of just trying to see what resources, who I can contact to try to get some information. I had no idea.
Q Well, isn't it true that she -- when you spoke to her that night of the 27th, she told you she wasn't aware that he was going to Senegal and she thought he was getting released?
A I believe that she may have said something along those lines. I know he tried to call. I'm not sure if he got in contact with her or not.
Q So when she said that she thought he was getting released, she meant she had talked to him prior to your conversation with her that night?

MR. ALGOR: Objection, Your Honor.

THE COURT: Sustained.

MS. ROSTAL: *United States versus Dietrich*, Your Honor. This would be non-hearsay.

THE COURT: Sidebar.

(Continued on the next page.)

(Sidebar conference.)

(The following occurred at sidebar.)

THE COURT: We've spent a significant time on this issue, we're on our third witness in a row, about making phone calls and conversations with his -- with your client's wife. I'm not sure why it's relevant to anything, and I think you're trying the jury's patience.

MS. ROSTAL: Fair enough.

THE COURT: And these minor points, I'm not sure if they advance your client's position or bear any relationship to elements of the charge, and so I'm not quibbling with the idea that you can use any document to question whether or not the witness is being credible or is biased in some way. I'm not sure that's what this is doing right now; A, because the predicate of what he's been saying, I'm not sure has any kind of inconsistency.

MS. ROSTAL: I'm not offering a statement for inconsistency. According to his report, my proffer is that he called the wife who stated that she was not aware that he was going to Senegal and thought he was coming home.

The relevance of that is that if the wife says to him that she believes he was coming home, it makes it more likely that Mr. Mbacke had a state of mind that he expressed to the wife that he thought he was being released.

THE COURT: Fair enough. I'll let you explore that document.

What's the objection?

MR. ALGOR: Your Honor, well there was no basis for the question that she's asked. She is asking what the wife thinks, not necessarily what the actual witness thinks. She's going into the mind of the wife.

THE COURT: And actually this is why *Dietrich* is exactly on point with this point is because you can ask either party, you can ask what the party's understanding to the help explore the state of mind of the defendant and so --

MR. ALGOR: He didn't understand her question, Your Honor. She is asking the wife's -- what the wife was thinking.

THE COURT: She certainly can ask what he understood based on his conversations with the wife. I agree with that, I will let you into --

MR. ALGOR: Ask him -- I'm sorry.

THE COURT: You had asked the question did she understand that he was to be released and was coming home, or he was to be released and he said, yes, I think you've established --

MS. ROSTAL: I felt like the timing of it was muddled but --

THE COURT: Okay, but --

MS. ROSTAL: -- I'm open to suggestion.

THE COURT: You can ask that question of this

witness as to what his understanding was based on his conversations with the wife about your client's intentions or the status of his deportation. But we've taken long enough to get there, and we've been over this ground, and the jury, frankly, I think is not necessarily in the wishing well. So you can explore this area the way I've suggested.

But I'm thinking as to the asked and answered objection --

MR. ALGOR: Yes, Your Honor.

THE COURT: -- usually it's my fourth or fifth time.

MR. ALGOR: We can go back and Ms. Rostal --

THE COURT: She can explore this area and then move on and explore areas that are pertinent to the understanding of what this was about.

MR. ALGOR: Thank you, Your Honor.

MS. ROSTAL: Fair enough.

(End of sidebar conference.)

(Continued on the next page.)

(In open court; Jury present.)

THE COURT: Thank you, ladies and gentlemen.

BY MS. ROSTAL:

Q Officer Lassiter, just so I'm clear, when you spoke to Mr. Mbacke's wife at -- would you agree it was around 9:38?

A I don't know the exact time. I believe it's on my paperwork that I wrote the times, if you want me to give an exact time, but I can't remember exactly what time.

Q So -- hang on one second.

May I approach, Your Honor?

THE COURT: Yes.

Q Showing you the 3500AL1, and I'm ask you to look at the second page first full paragraph.

THE COURT: Officer Lassiter, just don't read the document allowed, just read it to yourself.

THE WITNESS: Yes, Your Honor.

MS. ROSTAL: The second page.

(Whereupon, the witness is reviewing the document.)

Q Have you read it?

A Yes, it says, 9:38 p.m.

Q So if you called her at 9:38 p.m. and spoke to her, she had not heard from him between 8:51 and 9:38; is that correct?

A Well, when he left and we weren't able to contact him, I don't know who he contacted when he was sitting with his cousin or friend. He could have done any of that. I honestly

don't know.
I could say he didn't make any phone calls from my phone when he sat with his friends, but I don't know if he called anyone or not.
Q All right. But you had the impression from what his wife told you at 9:38 p.m. that she didn't know he was being deported to Senegal, true?
A That was what she stated, yes.
Q And that she had thought he was being released, based on her conversation with him prior to that, right?
A I believe that's what she stated, yes.
Q And did you have any anything to do with Mr. Mbacke's baggage or the bag? Did he check a bag?
A I didn't have anything to do with his baggage, ma'am, so I'm not sure. I think he was -- maybe it was before. I can't remember. I know I didn't deal with any baggage of his.
Q Okay. And he was cooperative that date with you, he wasn't disrespectful or rude in any way?
A No, I could tell he was kind of, you know, uncomfortable and uneasy, because he was worried about if he was going to know people or have family there, or have items or money to be able to send to him in his country, so he was worried about that.
MS. ROSTAL: Very good. Thank you.
THE COURT: Any redirect?

MR. ALGOR: No redirect, Your Honor.

THE COURT: Officer Lassiter, thank you. You may step down.

(Whereupon, the witness was excused.)

(Continued on next page.)

MR. ALGOR: If we can have a moment, your Honor?

THE COURT: Do you want to come to the sidebar.

MR. ALGOR: Yes, your Honor, before the next witness if that's okay.

(Continued on the next page.)

(Sidebar conference held on the record in the presence of the Court and counsel, out of the hearing of the jury.)

MR. ALGOR: Ms. Rostal raised an issue. Do you have it now.

MS. ROSTAL: I do.

MR. ALGOR: I didn't want to raise it in front of the jury. She had a problem with the redaction being black for one of the exhibits that I'm about to introduce. So if it fits, I just didn't want to raise this in be the front of the jury.

THE COURT: I understand.

MS. ROSTAL: Where is it? It's only this page because --

MR. CAMPOS: It's redacted.

MR. ALGOR: We're good.

MS. ROSTAL: Yes.

MR. ALGOR: I just want to make sure.

MR. CAMPOS: Does the Court have a copy?

THE COURT: Look, if it's been resolved to the parties' satisfaction we can go forward, right?

MR. ALGOR: Yes, your Honor.

THE COURT: The other thing is unless you're going to show this page.

MR. ALGOR: I am.

THE COURT: Then my suggestion will be it's been resolved and let's just move forward.

MR. ALGOR: Is it okay since there's going to be no objections to just moving these exhibits in?

THE COURT: You can do that any time when the jury is seated. You can do it after your last witness, in between witnesses. It's entirely up to you as to when you would like to introduce the documents. If you're going to introduce to with this witness you can do it before the witness comes up. Just show the witness the document and at the same time show it to the jury because it's in evidence.

MR. ALGOR: Yes, your Honor. Okay. Thank you.

(Sidebar discussion concludes.)

(Continued on the next page.)

(In open court.)

MR. ALGOR: Your Honor, at this time, the Government would move to admit Government Exhibits 1, 2, 3, 5, and 7.

THE COURT: Any objection?

MS. ROSTAL: No objection.

THE COURT: Okay. Government Exhibits 1, 2, 3, 5, and 7 are entered evidence without objection.

(Government's Exhibit 1, 2, 3, 5, and 7 were received in evidence as of this date.)

MR. ALGOR: Thank you, your Honor. The Government calls Deportation Officer Thomas Koval.

(Witness takes the witness stand.)

COURTROOM DEPUTY: State your full name for record and spell where last name.

THE WITNESS: Thomas Joseph Koval. Last name is spelled K-o-v-a-l.

COURTROOM DEPUTY: Please raise your right hand.

**THOMAS JOSEPH KOVAL**, called by the Government, having been first duly affirmed, was examined and testified as follows:

THE WITNESS: Yes, sir.

COURTROOM DEPUTY: You may have a seat and please speak into the microphone.

THE WITNESS: Yes, sir.

DIRECT EXAMINATION
BY MR. ALGOR:
Q Good afternoon.
A Good afternoon, sir.
Q Who do you work for?
A I work for the Department of Homeland Security Immigrations and Customs Enforcement.
Q Is Immigration and Customs Enforcement also known as ICE?
A Yes, sir.
Q What does ICE do?
A Our primary job is to enforce the Immigration and Nationality Act. We do that by the apprehension, detention, and physical removal of individuals.
Q How long have you worked for ICE?
A It would be three years in ago.
Q And who did you work for before that?
A I worked for the Federal Bureau of Prisons.
Q What is your title?
A I'm a Deportation Officer.
Q Where do you physically work?
A Our office is located in Detroit, Michigan.
Q What responsibilities do you have as a deportation officer?
A The section I worked in is called the Detained Docket. I'm a Detained Docket case officer.

Q And what is the Detained Docket?
A After a subject is arrested by ICE and they're placed in custody in one of our jails, then the case is referred to me. Being detained refers to the individual who is detained in ICE custody. My job from there is to effectuate the removal order by an immigration judge. I do that by obtaining travel documents, getting clearances from countries of citizenship, establishing identity and citizenship through embassies and consulate and scheduling removals.
Q Have you ever removed an individual from the United States based on an immigration judge's order?
A Yes, sir.
Q How many times have you removed someone from the United States?
A 10, 12 times.
Q When was the last time you removed an individual from the United States based on an immigration judge's order?
A Approximately a month ago.
Q And where was that mission to?
A It was to Albania, sir.
Q Does ICE have a policy regarding whether an individual being removed should be handcuffed?
A In transporting in a vehicle, yes. As pertaining to flying, no.
Q During the 10 to 12 trips where you removed someone from

the United States, how many times did you have him handcuffed?
A None.
Q I want to turn your attention to March 27th of this year. Were you working that day?
A Yes, sir.
Q What was your duty that day?
A In addition to my normal tasks of day-to-day operations in the Detained Docket, I also had a collateral duty of doing prisoner transport.
Q How many individuals did you have that day for the prison transport?
A One, sir.
Q Would you recognize the individual that you had on the prison transport on March 27th if you saw him?
A Yes, sir.
Q Do you see him today in the courtroom?
A Yes, sir.
Q Please point to him and indicate an article of clothing?
A White shirt, sir.
MR. ALGOR: Your Honor, indicating the defendant?
THE COURT: The Court notes that the witness has identified Mr. Mbacke.
Q Is that the first time you encountered the defendant?
A No, sir.
Q When was the first time that you encountered the

defendant?
A It would have been the day he was taken into custody by ICE.
Q When was that day?
A I think it was January 26th of this year, 2018.
Q Why did you encounter him on the day that he came into ICE custody?
A He is a citizen of Senegal and that is one the countries that I'm a case officer for.
Q Are you the defendant's case officer?
A Yes, sir.
Q What are your responsibilities as a case officer?
A Managing his case at that stage of the immigration process. Specifics of that includes manages his detention while he's in ICE custody in one of the jails. Establishing through working with an embassy or consulate to establish his citizenship and obtain a travel document, and be able with that travel document we can get clearance that we can physically schedule a removal we can fly that individual back to their country of citizenship.
Q Did you receive a travel document for the defendant?
A Yes, sir.
Q Approximately what date did you receive that document, if you recall?
A I remember it was very soon before his removal flight was

scheduled. It was, I believe, just days before.
Q Are you presently acting as the custodian of the Defendant's "A" File?
A Yes, sir.
Q What is an "A" File?
A "A" File stands for Alien File. Any hard documents that would be produced: Proof of services, of documents that print out, travel document request, information from consulates or embassies. They would all be put into his "A" File. It would be similar to, like, police departments refer to them as a case jacket or case logs things like that.
MR. ALGOR: Mr. Manson, if I may.
Q Officer Koval, I'm showing you what's been previously admitted into evidence as Government Exhibit 1.
Do you recognize this document?
A Yes, sir I do.
Q What is it?
A It's a notice to appear.
Q What is a notice to appear?
A A notice to appear is a charging document that's issued to an individual. It states what section of the Immigration and Nationality Act that the individual would be charged with for an immigration violation.
Q And turning your attention to the top of Page 1 of the notice up here.

Do you see who the individual is on this document?

A Yes, sir. This is the notice to appear for the defendant Mbacke.

Q Now, I want to turn your attention to Page 3 of the document. Actually let me -- sorry about that. Let me return back to the first page.

Can you please explain to the jury what the check at No. 3 is on the document?

A Yes, sir. The check number three says, "You have been admitted to the United States but are removable for the reasons stated below."

Q Okay. And does it list out the reasons for that there?

A In that section it says, See continuation page made a part here for or hereof.

Q Now, I'm going to turn your attention to Page 3 of the notice to appear. Let me zoom out for a second.

Now, I want to turn your attention to the top of the document.

Could you see that?

A Yes, sir.

Q Is this the continuation page for the notice to appear?

A Yes, sir, this is the continuation page for the defendant.

Q If you could explain to the jury what this page, what this page is about?

A This page here, as it says, the service alleges that you it states what the Government's charging claim is that would be 1 through 4. And also, underneath the dotted lines there where it says "Section 237," and the numbers that follow that that's the section of the Immigration and Nationality Act. That's the specific charges that would be sought after because this document after being issued because the court process for the individual to see an immigration judge.
Q And so, just to be clear this second portion is one of the statutes which would show the defendant's violation?
A That is correct, sir.
Q And now, I want to show you what's already in evidence as Government Exhibit 2.
Do you recognize this document?
A Yes, I do.
Q What is it?
A This is the defendant Mbacke's order from the immigration judge commonly referring as to a final order of removal.
What's a final order of removal?
Q What's a final order of removal?
A It's the judge's ruling on paper.
Q Do you see where the date of this final order is?
A Yes, sir.
Q What's the date of that order?
A It's the handwritten September 16, 2015.

Q What was the ultimate disposition of the defendant's removal proceedings?

A To be deported to Senegal.

Q And I'm going to zoom in at the bottom. If you could just explain what the bottom left means there?

A Yes. Where it says, "Appeal," where it's circled over "waived." That's nine section that if after the judge's ruling or his final order, the individual has the right to appeal that decision by the immigration judge. Here it's circled signifying that the defendant waived that right to appeal the decision.

Q I'm now going to show you what's already in evidence as Government Exhibit 7.

Do you recognize this document?

A Yes, sir, I do.

Q What is it?

A It's a motion for stipulated removal order and waiver of hearing.

Q And who is it in relation to?

A This is the stipulated removal order referring to defendant Mbacke.

Q And what is a stipulated removal order?

A It's a document that explains the rights an individual has, whether or not he wishes to waive those rights of a trial and also having a defense.

Q I want to first turn your attention to Page 3 of the exhibit which is actually marked as Page 1 of 10 of the stipulation.
Do you see that?
A Yes, sir.
Q And who is the stipulation for?
A For the defendant Mbacke.
Q And if you look at the bottom, I'll zoom in.
If you could just explain to the jury what the bottom portion of that document is?
A Yes, sir. On the bottom of each page, there's a section that the individual that this document is being served to initials and that also fingerprints with his right index finger.
Q And so, that line -- I know this is a copy -- but that would be his fingerprint?
A Yes, sir.
Q I'm going to turn to the next page of the document which is Page 2 of 10. And if you could please explain to the jury what the box checked at A means?
A Yes, sir. That's an A it says, "I do not wish to be represented in these proceedings by attorney or an authorized representative. I understand I can consult an attorney or authorized representative before signing the stipulation. And I wish to consult an attorney or authorized representative

before signing this stipulation. I wish to represent myself in these proceedings."

Q And, again, I want to slide this up a bit. The bottom portion.

Do you see the defendant's initials there?

A Yes, sir.

Q And the fingerprint as well?

A Yes, sir, that's correct.

Q I'm going to now turn to Page 4 of 10 of this document. I'm going to zoom in. Do you see Paragraph 8. I'm sorry, do you see Paragraph 8?

Can you read that, please?

A Yes, sir. It says, "I admit that all of the factual allegations contained in the notice to appear are true and correct. I also agree that I am removable as charged on the notice to appear."

Q What does that mean?

A As it states, it's an admittance that the charging document, that notice to appear, is true and correct.

Q And, again, at the bottom of the document, do you again see the initials and the fingerprint?

A Yes, sir.

Q Finally, I show you what's Page 8 of 10 of this exhibit. And what is this page?

A This is a conclusion or the ending of the stipulated

removal document. The last paragraph reads, "I certify that the information I provided in the stipulation is all true and correct. I understand that if any of the information I provided is false I maybe criminally prosecuted for perjury. Also, I understand that I may be criminal prosecuted for making a false statement to a United States official in any of the information I have provided is false or intentionally misleading. I understand that if I am convicted of either of these offenses, I could be find and sentenced up to five years in prison."

Q And is that signed by the defendant?

A Yes, sir.

Q And what's the date of that?

A That would be August 25th of 2015.

Q Now, I'm going to show you what's already in evidence as Government Exhibit 3.

Do you recognize this document?

A Yes, sir.

Q What is it?

A That's the defendant Mbacke's warrant of removal.

Q What is the purpose of a warrant of removal?

A A warrant of removal is proof of the immigration judge's final order to removal a specific individual. Also, within there, where it says, "As pursuant to the following provisions of the Immigration and Nationality Act," that would be a list

of the violations of the Immigration and Nationality Act, the INA. And also, on the bottom, there would be a signature that would give ICE authorization to be able to enforce the document in the immigration order in the final order.

Q And do you see a date on this document at the bottom?

A Yes, sir.

Q And what's the date?

A September 23, 2015.

Q And I'm going to show you now Page 2 of that document. What is this?

A That's Page 2 of the defendant Mbacke's warrant of removal. This page is proof that the warrant was executed and is done by verifying that the subject had been deported that the subject has left the United States.

Q And who fills out the portion of this form?

A This form would be completed by the removal officers?

Q And when is it executed?

A During the removal.

Q Now, I'm going to show you what's already in evidence as Government Exhibit 5 what is this document?

A That's the defendant Mbacke's notice to, notice of revocation of release.

Q What is the date of this document?

A January 26th of 2018.

Q What is a notice of revocation of release?

A Revocation of release is a document that is served to an individual whose order of supervision has been revoked. And this document signifies no longer on that order of supervision they're arrested and taken into ICE custody.
Q And does this notice of revocation or release indicate why --
MR. ALGOR: Withdrawn.
Q Who is this notice of revocation or release for?
A The defendant Mbacke.
Q And does this notice of revocation or release indicate why the defendant was taken into ICE custody?
A Yes, sir.
Q And what is that?
A It's failure to provide Senegal travel document.
Q And the date of this document is?
A January 26, 2018.
Q I want to show you the second page of this document. What is this?
A This is the proof of service. It's the second page for the notice of revocation for the defendant Mbacke. This is a proof of service that an ICE officer, an ICE agent, served that document and an individual is made aware of it.
Q Once the defendant's release is revoked, what happens to the defendant?
A The defendant is arrested by ICE, he's taken into

custody, and from there he would be transported to one of our county jails that we house individuals for immigration.

Q I want to turn back to March 27th of this year.

Did you bring the defendant to the Detroit Airport on that day?

A Yes, sir.

Q Who, if anyone, were you with?

A I was with one other ICE officer.

Q And what ICE officer was that?

A His name was shall Parminderjeet Siddhu.

Q Where was the defendant located when you encountered him that day?

A He was in the Dearborn, Michigan jail.

Q Did you go to Dearborn jail that day?

A Yes, sir.

Q What did you do once you arrived there?

A Requested for the officers to retrieve the individual for us. They brought him. Subject was handcuffed for the transport. Walked with him, placed in the back of our vehicle, and we drove to the Detroit officer.

Q And you mentioned it. Was the defendant handcuffed the entire time he was in your custody?

A Yes, sir.

Q Once you arrived at Detroit Airport what happened?

A We arrived. I made sure that the removal officers were

to meet us curbside by the airport. After that, I exited the vehicle. I opened the rear door. I took the handcuffs off of the defendant Mbacke.

Q And whether or not the officers that you -- that you were meeting at Detroit Airport?

A Deportation Officers Hall, Camaj, and Lassiter.

Q And you mentioned that you took his handcuffs off; is that right?

A Yes, sir. I was the one that placed them on and took them off.

Q Did you provide any documents to the three deportation officers when you transferred custody of the defendant?

A Yes, sir. We have what we refer to as a travel packet. I handed that to one of the officers.

Q What's a travel packet?

A A travel packet is everything that we would need inside the packet to effectuate the removal. It would have documents in it that would be necessary.

Q Would it include the defendant's travel documents?

A Yes, sir. It most definitely would.

Q Once you transferred the custody of the defendant to the three officers, what did you do next?

A I stood by. I ensured that they walked into the airport. After that, we went back to work.

MR. ALGOR: Can I have a moment, your Honor?

THE COURT: Yes.

MR. ALGOR: Nothing further.

THE COURT: At this time, we're going to adjourn for the day.

So, ladies and gentlemen, you're under the same instructions that I gave you ad nauseam over the last few days. Don't talk about the case with each other. Don't talk about it with your friends or your family. Don't do any research. Don't go on social media about the case. Don't go visit JFK Terminal 4 to do your own investigation. And please leave your notes in the jury room and do not take them home with you.

We'll see you promptly. We're going to start promptly at 9:30. As I said, I may have mentioned on Monday we're going to end around 12:30 or 12:45, so it's more of a half day tomorrow. And so, we're going to have a series of small breaks and I ask that you be in the jury room around 9:15 so that we can make sure that you get promptly started at 9:30. I thank you for your diligence and your service. Thank you.

All rise, please.

(Jury exits courtroom at 4:25 p.m.)

THE COURT: Please be seated. You may step down.

(Witness leaves the witness stand.)

THE COURT: I have parties here for another criminal

matter, but certainly, if there are things that we need to discuss or resolve before we adjourn for the day.

MR. ALGOR: Your Honor, just a few housekeeping matters.

THE COURT: Sure.

MR. ALGOR: One, just a question about the transcripts and what the Court would like from the parties if you would like for the jury whether we need to redact or are you going to do readbacks.

THE COURT: Why don't we cross that bridge when we come to it.

MR. ALGOR: Okay.

THE COURT: Sometimes it's not an issue and if it is, it is.

MR. ALGOR: So that's one. And just to give you an update, we'll have one it's short witness tomorrow and then the Government will rest.

Just to flag an issue, if Ms. Rostal tries to introduce the defendant's post-April 3rd statements which she's discussed prior which were after his initial appearance in front of a magistrate judge, I will call -- I plan to call the officer who interviewed him.

THE COURT: He, in other words, is potential rebuttal.

MR. ALGOR: Yes, sir.

MS. ROSTAL: I can think I can tell the Court and the Government that we do not plan to offer that evidence so that means to could be a short day tomorrow.

THE COURT: Well.

MS. ROSTAL: In one sense.

THE COURT: Let me ask you this if we have the cross-examination of this witness, we have another witness on direct and on cross is that the driver the vehicle.

MR. ALGOR: Yes, your Honor.

THE COURT: Okay. So I assume it's a relatively short witness. The question then is, would the defendant still intend to file a written Rule 29 motion?

MS. ROSTAL: Yes.

THE COURT: Okay. So you may do so, as I said before, I'll give the Government, you know, a day to submit a response and then we'll have the, you know, I also may have some questions which may happen after the Government rests or not. I don't know. And that means we're having a charge conference Friday morning and then, obviously, we have the defendant's case, if any, and then let's see where we are tomorrow.

MS. ROSTAL: I don't think there will be a defendant's case.

THE COURT: Okay. So it's possible that we could close and charge on Friday. So let's be prepared for that

eventuality. So it shouldn't come ace surprise if we do closing statements on a Friday that means late nights for everyone but welcome to trial.

Anything else from the Government?

MR. ALGOR: No, your Honor.

THE COURT: Okay. Ms. Rostal, anything else from you?

MS. ROSTAL: No, your Honor.

THE COURT: We'll see you tomorrow then.

(Defendant exits from courtroom at 4:30 p.m.)

(WHEREUPON, this matter was adjourned to June 21, 2018 at 9:30 a.m.)

* * *

INDEX


| | |
|---|---|
| **JENNA D'AVERSA** | 160 |
| CROSS-EXAMINATION | 160 |
| BY MS. ROSTAL | |
| REDIRECT EXAMINATION | 188 |
| BY MR. ALGOR | |
| RECROSS-EXAMINATION | 189 |
| BY MS. ROSTAL | |
| **SCOTT HALL** | 196 |
| DIRECT EXAMINATION | 197 |
| BY MR. ALGOR | |
| CROSS-EXAMINATION | 219 |
| BY MS. ROSTAL | |
| REDIRECT EXAMINATION | 248 |
| BY MR. ALGOR | |
| **JOSEPH CAMAJ** | 265 |
| DIRECT EXAMINATION | 265 |
| BY MR. ALGOR | |
| CROSS-EXAMINATION | 288 |
| BY MS. ROSTAL | |
| **AHMED LASSITER** | 319 |
| DIRECT EXAMINATION | 319 |
| BY MR. ALGOR | |
| CROSS-EXAMINATION | 335 |
| BY MS. ROSTAL | |

**THOMAS JOSEPH KOVAL** 353
DIRECT EXAMINATION 354
BY MR. ALGOR

**EXHIBITS**

Defendant's Exhibit B 164
Defendant's Exhibit C 174
Defendant's Exhibit D 176
Government's Exhibit 6 281
Government's Exhibit 1, 2, 3, 5, and 7 353
Defendant's Exhibit A 162